******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

# STATE OF CONNECTICUT *v.* ONAJE RODNEY SMITH
## (SC 20600)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of various crimes, including first degree robbery, first degree assault, second degree arson, and attempt to commit murder, charged in five cases that were joined for trial, the defendant appealed to this court. The defendant, along with G, P, and another individual, all of whom were fellow gang members, had agreed to rob a food deliveryman. When the deliveryman, H, arrived at the requested location, two men wearing dark clothing and ski masks approached him. One of the men pointed a gun at H's chest and demanded his wallet. After taking the wallet and the food, the two returned to a red hatchback and drove away. Five days after that incident, G's cell phone was used to place a delivery order at a restaurant. When the deliveryman, C, arrived at the requested location, he was approached by two men wearing ski masks and hoodies, one of whom was armed. The armed assailant shot C's phone out of his hand, and, when C requested that the men leave behind his wallet after they took his money, the armed assailant shot C in the leg. Both men then entered C's Toyota Camry and drove away. The red hatchback in which the men arrived followed the Camry. Later that night, the police responded to a report of a burning vehicle described as a burgundy Subaru Forester. A subsequent investigation revealed security camera footage from a nearby gas station showing both the Forester and the stolen Camry pulling into the gas station approximately one-half hour before the police received the report of the burning vehicle. The footage showed the driver of the Camry purchasing gas and then pumping it directly into the backseat of the Forester. Five days later, the defendant was driving with G, P, and another individual in the Camry when they saw F, a rival gang member. The defendant lowered the vehicle's front passenger window and fired a gun toward F, who ran away uninjured. The defendant later spotted F again, and, while wearing a ski mask, the defendant followed F into a convenience store and shot him in the head. The defendant then returned to the Camry, and the group drove away. Six days later, the police observed the Camry and, after learning that it had been stolen, conducted a stop of the vehicle. Both the defendant and G were apprehended while trying to flee the vehicle. At the time of his arrest, the police seized a cell phone from the defendant. The defendant filed a pretrial motion to suppress the evidence obtained pursuant to both a warrant issued for the search of his cell phone and a warrant issued to his cell phone's service provider for his phone records and cell site location information (CSLI). The trial court denied the motion. On direct appeal from the judgments of conviction, *held*:

1. The trial court improperly denied the defendant's motion to suppress the evidence obtained from the search of his cell phone because the applicable search warrant was not supported by probable cause and did not particularly describe the places to be searched and the things to be seized: the application for the warrant indicated that the defendant's cell phone constituted evidence that a particular person participated in aggravated assault, and the facts contained in the affidavit attached to the application were not sufficient to allow the judge issuing the warrant reasonably to conclude that there was probable cause to believe that evidence of the crime of aggravated assault would be found on the defendant's cell phone because, although the affidavit described in detail the robbery of H, the robbery and shooting of C, the theft of the Camry, the car arson, the shootings involving F, and G's role in those events, it did not mention the defendant's involvement in or connection to those events, and the defendant's cell phone was likewise never tied to the crime of aggravated assault; moreover, even if sufficient probable cause existed, the warrant would fail for lack of particularity insofar as it did not sufficiently limit the search of the contents of the

cell phone by a description of the areas within the phone to be searched or by a time frame reasonably related to the crimes.

2. The trial court improperly denied the defendant's motion to suppress the evidence obtained from his cell phone's service provider because the applicable search warrant was not supported by probable cause: the warrant indicated that the defendant's cell phone had been or could have been used as a means of committing the offense of attempt to commit murder, and the issuing judge reasonably could not have concluded that there was a substantial chance that evidence of the shooting of F would be found in the defendant's cell phone records, as nothing in the affidavit submitted in connection with the warrant connected the defendant to the attempt to murder F or demonstrated that his cell phone was either used during the commission of that crime or otherwise contained evidence of it; moreover, the state could not prevail on its claim that, because the affidavit referred to the defendant's arrest warrant that was issued on facts sufficient to constitute probable cause that the defendant was involved in the shooting of F, the judge issuing the search warrant was entitled to rely on the arrest warrant to establish probable cause, as a determination of probable cause for an arrest requires different findings than a determination of probable cause for a search warrant, and the search warrant affidavit did not contain the factual allegations and evidence that led to the defendant's arrest, which would have enabled the issuing judge to determine whether those allegations established probable cause to believe that evidence of the attempt to murder F existed in the cell phone carrier records at issue; furthermore, this court determined that there was insufficient information to assess the validity of the defendant's claim that the search warrant for the defendant's cell phone records lacked particularity, because, although the warrant identified a specific list of items to be searched and seized, and sought records only for a limited duration that were reasonably connected with the attempt to murder F, there was a lack of information in the affidavit relating to the defendant's role in that crime or the connection between the defendant's cell phone and the crime.

3. Any error in denying the defendant's motion to suppress the evidence obtained pursuant to the two search warrants was harmless with respect to the charges relating to the robbery of H, the shootings involving F, and the defendant's attempt to flee from the Camry to avoid arrest, but was harmful with respect to the charges relating to the robbery and shooting of C, the larceny of the Camry, and the car arson: the evidence against the defendant with respect to the robbery of H was principally derived from P's testimony, and there was no data from the cell phone or the defendant's cell phone service provider relating to that incident; moreover, the state established a motive for the shootings involving F, and video surveillance footage corroborated P's testimony relating to one of the shootings; furthermore, it was highly unlikely that the CSLI from the defendant's phone, which placed him in the area where the stolen Camry was stopped by the police, affected the jury's decision with respect to the charge of interfering with an officer, as the police apprehended the defendant after he attempted to flee from that vehicle and his fingerprints were discovered inside the vehicle; nevertheless, the CSLI was the most concrete and direct evidence placing the defendant at the scene of the robbery and assault of C, where the Camry was also stolen, and the omission of the CSLI would have reduced the certainty that the defendant was involved in the burning of the Forester; accordingly, this court affirmed the defendant's convictions relating to the robbery of H, the shooting of F, and his flight from the police but reversed the defendant's convictions relating to the robbery and shooting of C, the theft of the Camry, and the burning of the Forester.

Argued March 22—officially released August 9, 2022

*Procedural History*

Substitute information, in the first case, charging the defendant with one count each of the crimes of accessory to robbery in the first degree and conspiracy to commit robbery in the first degree, substitute information, in the second case, charging the defendant with one count each of the crimes of accessory to robbery

in the first degree, conspiracy to commit robbery in the first degree, and accessory to assault in the first degree, substitute information, in the third case, charging the defendant with one count each of the crimes of accessory to arson in the second degree and conspiracy to commit arson in the second degree, substitute information, in the fourth case, charging the defendant with two counts of the crime of attempt to commit murder and one count of the crime of conspiracy to commit murder, and substitute information, in the fifth case, charging the defendant with one count each of the crimes of larceny in the third degree and interfering with an officer, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the cases were consolidated; thereafter, the court, *White, J.*, denied the defendant's motion to suppress certain evidence; subsequently, the cases were tried to the jury before *Blawie, J.*; verdicts and judgments of guilty, from which the defendant appealed. *Affirmed in part*; *reversed in part*; *new trial*.

*Jennifer B. Smith*, assistant public defender, with whom, on the brief, was *Mark Rademacher*, senior assistant public defender, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom were *Thadius L. Bochain*, deputy assistant state's attorney, and, on the brief, *Paul J. Ferencek*, state's attorney, and *Michelle Manning*, senior assistant state's attorney, for the appellee (state).

*Robert C. Santoro* filed a brief for Grayshift, LLC, as amicus curiae.

*Marisol Orihuela* and *Jim Davy*, pro hac vice, filed a brief for Upturn, Inc., as amicus curiae.

*Opinion*

KAHN, J. The defendant, Onaje Rodney Smith, appeals directly to this court from the judgments of the trial court convicting him of various crimes arising from five consolidated cases, the most serious of which included first degree robbery, second degree arson, and attempt to commit murder.[1] On appeal, the defendant claims that the trial court improperly denied his motion to suppress evidence discovered during a search of his cell phone and evidence obtained from T-Mobile, his cell phone service provider, because the warrants authorizing those searches were not supported by probable cause and lacked sufficient particularity to comport with the fourth amendment to the United States constitution.[2] The state disagrees with each of these claims and asserts, in the alternative, that any error was harmless. For the reasons that follow, we agree with the defendant that the trial court erred in denying his motion to suppress the information obtained from the execution of both warrants. We further conclude, however, that this error was harmless with respect to some, but not all, of the crimes alleged. As a result, we affirm in part and reverse in part.

The following facts, which the jury reasonably could have found from the evidence admitted at trial, and procedural history are relevant to our review of the defendant's claims. On January 9, 2017, Tyreik Gantt, Jeremy Middleton, Jaiden Parker, and the defendant, all members of the Milla Death Row gang,[3] went for a drive in Norwalk inside of a stolen red hatchback. During that drive, the group agreed to rob a food deliveryman. At approximately 6:34 p.m., an internet search for "China Moon Norwalk, CT" was conducted on an iPhone owned by Gantt. Parker then used Gantt's pay-as-you-go Tracfone to place an order for food from China Moon Restaurant.

Wuquiang Huang, the deliveryman for China Moon Restaurant, testified that he arrived at 4 Rolling Lane in Norwalk at approximately 7 p.m. to deliver the food. When Huang exited his vehicle to make the delivery, he was approached by two men wearing dark clothing and ski masks. One of the men brandished a black handgun, held it "[a]bout an inch" from Huang's chest, and demanded Huang's wallet. The armed man then took Huang's wallet, which contained a souvenir Chinese bill, while the other masked man took the food that Huang had brought with him. The two men then entered the car they had arrived in, which Huang described as a red vehicle with four doors and "no trunk in the back."[4] A third man, who had been in the driver's seat of the vehicle, then drove away.

On January 14, 2017, at approximately 6:09 p.m., Gantt's iPhone was used to search "China Town Express Norwalk, CT" and two phone calls to that restaurant

then were made on his Tracfone. Fen Yen Chen, the deliveryman for China Town Express, drove a 2011 black Toyota Camry with New York license plates to make that delivery at 19 Derby Road in Norwalk. When Chen was unable to locate the address, he called the number listed on the receipt for the order, which was associated with Gantt's Tracfone, and was told by the man who answered that the address was "a house right across from the red car."

Chen parked the Camry near the red car and left it with the engine running. Chen then saw two men wearing ski masks, hoodies, and gloves get out of the passenger side of the red car and approach him. Chen pretended to call 911 when one of those men brandished a gun, but the armed assailant subsequently shot the phone out of his hand. Chen then asked the men to take his money but to leave his wallet. In response, the unarmed assailant told his companion to shoot Chen. The armed assailant then shot Chen in the thigh. Chen fell to the ground and handed the men money from his pocket. Both men then got into Chen's Camry and drove away. The red car in which they had come followed. During the ensuing investigation into the crimes against Chen, the police found two .25 caliber shell casings. Forensic testing later determined that those two shell casings were fired from the same gun.

Around 8:15 p.m. that same evening, police officers responded to reports of a burning vehicle on Oakwood Place, a street in Stamford. One of the responding officers described that vehicle as a burgundy Subaru Forester. In the investigation that followed, police officers determined that someone had intentionally lit a fire in the rear passenger seat of that vehicle using gasoline as an accelerant.

Police officers subsequently viewed security camera footage from a Shell gas station located at 243 West Avenue in Stamford from the day of the Chen robbery and vehicle fire. That footage showed the red Subaru Forester pulling into the gas station with the stolen black Camry at approximately 7:44 p.m. on January 14. That same footage showed the driver of the Camry entering the store to purchase gas while a passenger remained in the back seat. After purchasing the gas, the driver of the Camry exited the store and proceeded to pump gas directly into the backseat of the Forester while the Forester's driver stood watch. At trial, Parker identified Gantt as the driver of the Camry who purchased and pumped the gas.

Parker testified that, on January 19, 2017, Gantt and the defendant drove the stolen Camry to pick up Parker and another friend, Shahym Ranero, from their respective residences in Stamford. While driving around Stamford, the group was looking for Gregory Flemming, a rival gang member[5] they "had a beef with." According to Parker, their intention was to "[l]ikely shoot at [Flem-

ming]" or otherwise "deal with [him]." Parker stated that the group eventually spotted Flemming, who had dreadlocks and was wearing florescent striped pants, while they were driving down High Street in the Camry. The defendant then allegedly lowered the window of the front passenger seat and fired a .25 caliber handgun toward Flemming. Flemming, uninjured, then took off running toward West Main Street.[6]

Following the shooting, the group drove to a plaza on West Main Street where Gantt, Parker, and Ranero smoked marijuana. About ten minutes later, the group drove to a convenience store on West Main Street. As they proceeded to the store, the defendant again spotted Flemming and allegedly said, "I'm going to clean [Flemming] up . . . ."

Parker testified that the defendant proceeded to enter the store wearing a face mask and carrying the same .25 caliber gun he had used on High Street. Parker testified that he saw the defendant "put the gun to [Flemming's] head . . . and [pull] the trigger." Although Parker himself witnessed only one shot, he testified that, after the defendant returned to the vehicle, he admitted to "let[ting] off a couple more." The group then drove away in the black Camry.

The police received a call at approximately 7:04 p.m. reporting that a black male with dreadlocks had been shot in the head at a store located at 417 West Main Street in Stamford. Responding emergency personnel observed that Flemming had been shot twice—once in the head and once in the leg. A subsequent review of the store's surveillance footage showed Flemming walking into the store, followed moments later by a gunman who had emerged from a dark colored four door sedan. The gunman can be seen shooting Flemming in the head and then leaving in the same sedan. The store's surveillance footage showed that the shooter was wearing a black jacket, black shoes, black gloves, dark colored pants, and a mask. Video surveillance footage from an apartment building on Bedford Street approximately one hour before the shooting showed the defendant wearing clothing matching that of the shooter captured on the store's video. Bullet casings from a .25 caliber gun subsequently recovered by the police inside of the store were later matched to the same gun that had been used to shoot Chen.

On January 25, 2017, Keith Hanson, a Bridgeport police officer, observed a four door black Toyota Camry with New York license plates parked in the Beechwood Avenue area of Bridgeport. Hanson asked dispatch about the Camry and learned that it was stolen and had been "used in a carjacking and robbery" in Norwalk. After Hanson radioed for backup, an officer in a marked police vehicle conducted a stop of the Camry. Gantt, the operator of the Camry, tried to drive away but failed after colliding with a pole. Gantt tried to escape on foot

but was apprehended. The defendant, a passenger in the Camry, also attempted to flee on foot but was apprehended. As part of a search incident to the arrest, police officers seized two cell phones from the defendant's person, as well as a "dark gray knit hat/face mask."

While searching the Camry later, investigators located the defendant's fingerprints on the right passenger door of the Camry and on a cigar wrapper found inside the car. The investigators also found a phone owned by Gantt, which had a souvenir Chinese bill between the phone and its protective cover. At trial, Huang identified that bill as the one stolen from him on January 9, 2017.

The defendant was charged in five different files. In the first case, the defendant was charged with robbery in the first degree in violation of General Statutes §§ 53a-8 (a) and 53a-134 (a) (4) and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (4) for the robbery of Huang on January 9, 2017, in Norwalk. In the second case, the defendant was charged with robbery in the first degree in violation of §§ 53a-8 (a) and 53a-134 (a) (1), conspiracy to commit robbery in the first degree in violation of §§ 53a-48 (a) and 53a-134 (a) (1), and assault in the first degree in violation of General Statutes §§ 53a-8 (a) and 53a-59 (a) (1) for the crimes against Chen on January 14, 2017, in Norwalk. In the third case, the defendant was charged with arson in the second degree in violation of General Statutes §§ 53a-8 (a) and 53a-112 (a) (1) (B) and conspiracy to commit arson in the second degree in violation of §§ 53a-48 (a) and 53a-112 (a) (1) (B) for the burning of the Forester on January 14, 2017, in Stamford. In the fourth case, the defendant was charged with two counts of attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a, and one count of conspiracy to commit murder in violation of §§ 53a-48 (a) and 53a-54a for the drive-by shooting and the shooting of Flemming on January 19, 2017, in Stamford. Finally, in the fifth case, the defendant was charged with larceny in the third degree in violation of General Statutes §§ 53a-8 (a) and 53a-124 (a) (1) and interfering with an officer in violation of General Statutes § 53a-167a (a) for being found in the stolen Camry and attempting to evade police capture in Bridgeport on January 25, 2017. The defendant elected to have his cases tried before a jury, and the court, *Blawie, J.*, granted the state's motion to join all five of the defendant's files for trial.

On December 19, 2018, the defendant filed a pretrial motion to suppress evidence obtained in connection with two search warrants—one issued on February 16, 2017, for a search of a cell phone seized from the defendant when he was arrested, and another issued on September 19, 2018, for phone records and cell site location information (CSLI) obtained from that cell phone's service provider, T-Mobile. The court, *White, J.*, heard argu-

ment on the defendant's motion to suppress and denied it in an oral decision.

The jury ultimately returned a verdict finding the defendant guilty on all counts. He was sentenced to a total effective term of imprisonment of thirty-five years, with ten years of special parole.[7] This direct appeal followed. Additional facts and procedural history will be set forth as necessary.

In the present appeal, the defendant claims that the trial court improperly denied his motion to suppress evidence obtained pursuant to (1) the February 16, 2017 search warrant for data on his cell phone, and (2) the September 19, 2018 search warrant for his T-Mobile phone records. Specifically, the defendant claims that both warrants were not supported by probable cause and lacked sufficient particularity. The state disagrees and, in the alternative, argues that any error with respect to the denial of the defendant's motion to suppress was harmless beyond a reasonable doubt. We address the defendant's claims with respect to the validity of these two warrants, respectively, in parts I and II of this opinion. We then address the state's claim of harmless error in part III of this opinion.

I

We begin with the defendant's first claim that the trial court improperly denied his motion to suppress evidence obtained from the search of his Samsung cell phone because the search warrant was not supported by probable cause and did not particularly describe the place to be searched and the things to be seized. For the following reasons, we agree with the defendant on both points.

The following additional undisputed facts and procedural history are relevant to our consideration of this claim. On February 16, 2017, Stamford police officers applied for a search warrant for a white Samsung phone and a black Alcatel flip phone found on the defendant when he was arrested.[8] Specifically, the officers requested permission to "do a data extraction" on the phones and described them by their make, color, and serial number. The application further indicated that the cell phones "constitute[d] evidence . . . that a particular person participated in" aggravated assault in violation of § 53a-59.

The affidavit attached to the application made the following factual assertions. During their investigation into the January 14, 2017 arson of the red Subaru Forester, Stamford police officers learned that the Forester had been stolen during a carjacking in Bridgeport on January 8. The Stamford officers then learned from Norwalk police officers that multiple suspects had used a red Subaru Forester to facilitate an armed robbery of a food deliveryman in Norwalk, who was shot twice and who had his Toyota Camry with New York license

plates stolen by the suspects on January 14. Investigators located two .25 caliber shell casings at the scene of the Norwalk robbery.

The affidavit then discussed how further investigation revealed that, on January 14, 2017, the stolen Camry and Forester were seen on surveillance cameras pulling into a gas station in Stamford together at approximately 7:44 p.m. That footage showed Gantt, who was operating the Camry, exiting that vehicle and pumping gas directly into the backseat of the Forester, while the driver of the Forester stood next to him. Both vehicles left the gas station together and, then, at approximately 7:50 p.m., the Forester was discovered burning nearby.

The affidavit then described the January 19, 2017 drive-by shooting and the subsequent shooting of Flemming. Specifically, the affidavit stated that a "dark colored vehicle . . . with possible New York plates" was used in both shootings. Investigators located multiple .25 caliber shell casings at the scenes of both shootings, all of which were fired from the same gun, which was also the same gun used in the shooting of the food deliveryman on January 14. A reliable, confidential informant then implicated Gantt in the shooting of Flemming.

The defendant in the present case is first mentioned in paragraph seventeen of nineteen paragraphs of the warrant affidavit. It avers that, on January 25, 2017, Bridgeport police officers stopped the stolen Camry and arrested Gantt, the defendant, who was a front passenger in the vehicle, and a third individual, all of whom were subsequently charged with larceny in the second degree and interfering with a police officer. The only other paragraph that mentions the defendant is the final paragraph, which reiterates that, on "January 25, 2017, Bridgeport police stopped a stolen motor vehicle and arrested the occupants, one of [whom] was [the defendant]. . . . [The defendant] was in possession of two cell phones that were taken as evidence. Stamford police were aware of a 'Facebook' Live video that showed . . . Gantt and [the defendant] talking with each other. Bridgeport police turned over the two cell phones to Stamford police to assist in [their] investigation. [The] Stamford Police Forensic Unit would like to do a data extraction on both cell phones." Other than the reference to Stamford police officers being aware that the defendant and Gantt had appeared together on a Facebook Live video,[9] the affidavit does not describe the date, time, location, device used to record, content of that particular posting, or its relationship to the underlying offense under investigation.

## A

We begin by setting forth the applicable standard of review of a trial court's decision on a motion to suppress. "A finding of fact will not be disturbed unless it

is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Brown*, 331 Conn. 258, 271–72, 202 A.3d 1003 (2019). Additionally, "[w]hether the trial court properly found that the facts submitted were enough to support a finding of probable cause is a question of law. . . . The trial court's determination on [that] issue, therefore, is subject to plenary review on appeal." (Internal quotation marks omitted.) *State* v. *Buddhu*, 264 Conn. 449, 459, 825 A.2d 48 (2003), cert. denied, 541 U.S. 1030, 124 S. Ct. 2106, 158 L. Ed. 2d 712 (2004).

Furthermore, the governing law guiding our probable cause analysis is well established. "Both the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution prohibit the issuance of a search warrant in the absence of probable cause. . . . Probable cause to search is established if there is probable cause to believe that (1) . . . the particular items sought to be seized are connected with criminal activity or will assist in a particular . . . conviction . . . and (2) . . . the items sought to be seized will be found in the place to be searched. . . . There is no uniform formula to determine probable cause— it is not readily, or even usefully, reduced to a neat set of legal rules—rather, it turns on the assessment of probabilities in particular factual contexts . . . . Probable cause requires less than proof by a preponderance of the evidence . . . . There need be only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause . . . . [T]he relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts. . . . The task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." (Citations omitted; internal quotation marks omitted.) *State* v. *Sawyer*, 335 Conn. 29, 37–38, 225 A.3d 668 (2020).

"In our review of whether there was probable cause

to support the warrant, we may consider only the information that was actually before the issuing judge . . . and the reasonable inferences to be drawn therefrom. . . . The judge is entitled to rely on his own common sense and the dictates of common experience, although the standard for determining probable cause is an objective one. . . . We review the issuance of a warrant with deference to the reasonable inferences that the issuing judge could have and did draw . . . and . . . uphold the validity of [the] warrant . . . [if] the affidavit at issue presented a substantial factual basis for the [judge's] conclusion that probable cause existed." (Citations omitted; internal quotation marks omitted.) Id., 38.

The question before us is whether, based on the totality of the circumstances described in the affidavit and the reasonable inferences drawn therefrom, the issuing judge reasonably could have concluded that there was probable cause to believe that evidence of aggravated assault would be found in the defendant's cell phone. We do not believe that the affidavit reasonably supports such a conclusion.

The trial court determined that there was adequate probable cause because the defendant was arrested along with Gantt when officers apprehended them in the stolen Camry that was taken during the Norwalk robbery of Chen and that was used during the arson of the Forester and the shootings of Flemming in Stamford, both on High Street and in the West Main Street store. The trial court also based its conclusion on the fact that the same gun had been used during all of these incidents. Finally, the trial court referenced the Stamford Police Department's knowledge that the defendant and Gantt had engaged in a discussion with one another on Facebook Live.

We conclude that the trial court incorrectly determined that the warrant affidavit contained sufficient facts on which to base a finding of probable cause to search the defendant's cell phone. The facts contained in the warrant affidavit were not sufficient to allow the judge issuing the warrant reasonably to conclude that probable cause existed to believe that evidence of the crime of aggravated assault, which occurred during a robbery on January 14, 2017, would be found on the defendant's cell phone seized on January 25.

First, we note that the facts relating to the defendant in the affidavit are sparse. The averments contained therein show only that the defendant happened to be inside of a stolen vehicle with Gantt, in a different city, several days after the crimes against both Chen and Flemming. Although the warrant affidavit describes in detail the robbery of Huang, the robbery and shooting of Chen, the theft of the Camry, the arson of the Forester, the shootings of Flemming, and Gantt's role in those crimes, it did not mention the defendant's involvement in or connection to those offenses. The only men-

tion of the defendant in the affidavit was in two paragraphs at the end, which stated that he was arrested as the front passenger in the vehicle stolen during the Chen robbery and shooting, and that he was charged with larceny and interfering with an officer. The last paragraph notes that the defendant was in possession of two cell phones, which were taken into evidence, and that he had been seen on a posted Facebook Live video having a conversation with Gantt at some unknown time and location prior to his arrest in Bridgeport. There was no information in the warrant about the content of that Facebook Live video and its connection or relationship to any of the events leading up to the defendant's arrest.[10] Unlike the information contained in the warrant describing the video of Gantt pumping gas into the Forester and a reliable confidential informant's identification of Gantt from that video, there is no mention or description of the defendant or his connection to those offenses. These facts, in and of themselves, fail to establish a nexus between the defendant and the alleged crime of aggravated assault. See *Warden* v. *Hayden*, 387 U.S. 294, 307, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967) (there must be a "nexus . . . between the item to be seized and criminal behavior").

Moreover, the defendant's Samsung cell phone was likewise never tied to the crime of aggravated assault. There must be more than just probable cause that a crime has been committed; there must also be, within the four corners of the affidavit, facts adequate for a judicial officer to form a reasonable belief that evidence of that crime will be found in a particular place. See, e.g., *State* v. *Colon*, 230 Conn. 24, 34, 644 A.2d 877 (1994) ("the information to establish probable cause must be found within the affidavit's four corners"). Other than his presence in the stolen Camry eleven days after the crime, nothing in the warrant affidavit suggested that the defendant was present during the robbery and shooting of Chen, that he used the cell phone during the planning or commission of the aggravated assault, or that he possessed the cell phone at the time of the offense. The warrant application asserts that the Samsung cell phone "constitute[d] evidence" of aggravated assault, but the affidavit attached to it gives no description of how that cell phone was itself evidence of the crime, connected to the crime, or otherwise contained evidence of the crime.[11] For the foregoing reasons, we conclude that the warrant to search the defendant's cell phone was not supported by probable cause.

B

Even if we were to determine that sufficient probable cause existed to search the defendant's cell phone, we would also agree with the defendant that the cell phone warrant would fail for lack of particularity of the places to be searched and the things to be seized.

The standard of review for whether a warrant satis-

fies the particularity requirement of the fourth amendment to the United States constitution is well established. "Whether a warrant is sufficiently particular to pass constitutional scrutiny presents a question of law that we decide de novo." (Internal quotation marks omitted.) *State* v. *Buddhu*, supra, 264 Conn. 467. A search warrant satisfies the fourth amendment's particularity requirement "if it identifies the place or thing for which there is probable cause to search with sufficient definiteness to preclude indiscriminate searches." Id., 458–59. Further, "[t]he particularity requirement has three components. First, a warrant must identify the specific offense for which the police have established probable cause. . . . Second, a warrant must describe the place to be searched. . . . Third, the warrant must specify the items to be seized by their relation to the designated crimes." (Citations omitted; footnote omitted; internal quotation marks omitted.) *United States* v. *Galpin*, 720 F.3d 436, 445–46 (2d Cir. 2013).

In the present case, the trial court found that the cell phone warrant was particular because it was "as specific as it could be" when it asked for a full data extraction and identified the cell phone to be searched as a "Samsung color white" with the associated serial number. We disagree that this was enough to satisfy the fourth amendment's particularity requirement.

The United States Supreme Court has stated that "[c]ell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person." *Riley* v. *California*, 573 U.S. 373, 393, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014). Indeed, the court in *Riley* noted that "nearly [three quarters] of smart phone users report being within five feet of their phones most of the time, with 12 [percent] admitting that they even use their phones in the shower. . . . [I]t is no exaggeration to say that many of the more than 90 [percent] of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate." (Citations omitted.) Id., 395. The court in *Riley* further described how the quantitative and qualitative differences in electronic devices include the "immense storage capacity" of cell phones; id., 393; their "ability to store many different types of information"; id., 394; their functioning as "a digital record of nearly every aspect of their [owners'] lives"; id., 395; and their ability to "access data located elsewhere . . . ." Id., 397. Industry studies conducted by the Cellular Telecommunications Industry Association (CTIA) indicate that reliance on wireless technology, including mobile devices, increases yearly.[12] Given the privacy interests at stake in a search of a cell phone, as acknowledged in *Riley* and confirmed by the CTIA annual survey, the fourth amendment's particularity requirement must be respected in connection with the breadth of a permissible search of the contents of a cell phone.

Accordingly, we conclude that a warrant for the search of the contents of a cell phone must be sufficiently limited in scope to allow a search of only that content that is related to the probable cause that justifies the search.

In this case, the cell phone warrant was defective for failing to meet the particularity requirement of the fourth amendment. The warrant not only failed to connect the defendant to the crime of aggravated assault and to establish the probable cause to believe that his cell phone would contain evidence of that crime, it also failed to provide the type of information sought by its authorization. The warrant authorized a search of a "data extraction," which allowed for a search of the entire contents of the cell phone. The warrant failed to list types of data this particular device or cell phones in general contain, and the types of data on the phone the affiants sought to search and seize, such as cell phone call logs, text messages, voice messages, photographs, videos, communications via social media, or other evidence of the crime of aggravated assault.[13] Further, it included no time parameters to cabin the scope of the search but, rather, allowed for the entire contents of the phone to be searched for all time. See, e.g., *United States* v. *Wey*, 256 F. Supp. 3d 355, 387–88 (S.D.N.Y. 2017) (warrants failed, in part, because they did not contain "any relevant [time frame] or dates of interest"). Thus, we conclude that the search warrant did not comply with the particularity requirement because it did not sufficiently limit the search of the contents of the cell phone by description of the areas within the cell phone to be searched, or by a time frame reasonably related to the crimes. Therefore, the trial court improperly denied the defendant's motion to suppress the evidence obtained with respect to the cell phone search warrant.

II

We turn now to the defendant's second claim that the trial court improperly denied his motion to suppress evidence obtained pursuant to a search warrant of his T-Mobile phone records because the warrant was not supported by probable cause and did not particularly describe the places to be searched and the things to be seized. As with the first warrant, we agree with the defendant that this second warrant also was not supported by probable cause, but we lack sufficient information to determine whether the second warrant was sufficiently particular.

The following additional undisputed facts and procedural history are relevant to our consideration of this claim. On September 19, 2018, the court issued a search warrant for various records from T-Mobile, the mobile service provider associated with the defendant's Samsung phone. This warrant was served on and records were obtained from T-Mobile.

Pursuant to this warrant, Stamford police officers requested to search and seize phone records associated with the defendant's "white Samsung cell phone" between January 7, 2017, at 11:59 p.m., and January 25, 2017, at 11:59 p.m. The warrant identified various categories of information sought, including "subscriber information, [cell phone] information, including call records of incoming and outgoing calls, SMS text messages, [e-mail] information and messages, social media messages, video recordings, digital images, voice mail recordings, GPS data, [g]eo-locator, and any other data/information stored on the [device], internal memory or removable storage media, and/or any data the [device] has access to through a cellular [n]etwork/[Wi-fi]/Bluetooth connection." The warrant further provided that the phone "is possessed, controlled, designed or intended for use or which is or has been or may be used as the means of committing the criminal offense of: [c]riminal [a]ttempt [at] [m]urder [§§] 53a-49/53a-54a."

The affidavit accompanying the warrant made the following factual assertions. During their investigation of the arson of the Forester, Stamford police officers learned that it had been stolen during a robbery in Bridgeport six days earlier. The affidavit then described how Stamford police officers were dispatched to a shooting at a convenience store on West Main Street where they found Flemming with a gunshot wound to his head. The affidavit further alleged that, "during the investigation of [those] crimes, [Gantt] and [the defendant] were developed as potential suspects" and were arrested in Bridgeport on January 25, 2017, "for unrelated crimes," larceny and interfering with a police officer by resisting arrest, resulting in the seizure of the defendant's cell phone. Next, the affidavit stated that, on February 17, 2017, "after an extensive investigation [that] included multiple search warrants and interviews, arrest warrants were applied for and eventually granted for both [Gantt and the defendant] for the shooting of [Flemming] on January 14, 2017." The affidavit then provided that "the data requested may be of evidentiary value as it may assist with identifying the person/persons who shot [Flemming], the location of [the defendant] at the time of the shooting, and other crimes."

In denying the defendant's motion to suppress the evidence obtained from T-Mobile, the trial court concluded that the warrant affidavit set forth probable cause based on the defendant's and Gantt's being arrested together on January 25, 2017, the defendant's possession of two cell phones at that time, and the fact that the Camry and Forester were "connected with the Norwalk robbery and the Stamford shooting and robbery . . . ." With respect to particularity, the court noted that it was "specific as to the phone, phone number, dates . . . and the contents to be searched."

A

The applicable standard of review and governing law related to a probable cause analysis are the same as we iterated in part I A of this opinion. Therefore, we must determine whether, on the basis of the totality of the circumstances described in the affidavit and the reasonable inferences drawn therefrom, the issuing judge reasonably could have concluded that there was a substantial chance that evidence of the shooting of Flemming would be found in the defendant's phone records. We hold that the affidavit does not reasonably support such a conclusion.

We note that the warrant "must establish probable cause to believe" not only that an item of evidence "is likely to be found at the place to be searched"; *Groh* v. *Ramirez*, 540 U.S. 551, 568, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004) (Kennedy, J., dissenting); but also that there is "a nexus . . . between the item to be seized and [the] criminal behavior." *Warden* v. *Hayden*, supra, 387 U.S. 307. As with the first warrant, nothing within the four corners of this affidavit connects the defendant to the crime mentioned, attempted murder, or shows that his cell phone was either used during the commission of that crime or otherwise contained evidence of it. The affidavit fails to tie the defendant to the crime or even mention that multiple suspects were involved in the commission of the crime.

The trial court found probable cause on the basis of the defendant's arrest with Gantt, the defendant's possession of two cell phones during his arrest, and the fact that the "Toyota and the Subaru were connected with the Norwalk robbery and the Stamford shooting and robbery . . . ." However, this particular affidavit, unlike the affidavit filed in support of the first warrant, did not contain any information about the robberies of Huang or Chen. The eight paragraphs of the warrant on a single page referenced a vehicle fire and a carjacking but not the details contained in the first warrant. It also did not mention the fact that the defendant and Gantt were arrested together in possession of the stolen Camry. With regard to the offense for which the warrant was sought, the attempted murder of Flemming, the warrant contained a single paragraph indicating that the police had reported to a shooting in Stamford and the identity of the victim. Other than a conclusory statement that Gantt and the defendant were developed as suspects for the "said crimes" and that a judge had signed arrest warrants for both men in connection with the shooting of Flemming, there was no factual description of the defendant's role in or connection to the offenses that formed the basis for the arrest warrants. Although the affidavit contained information that the defendant was in possession of a Samsung cell phone with a T-Mobile phone number at the time of his arrest on January 25, 2017, it did not mention how that device was connected to, or otherwise contained evidence of,

the offense of attempt to commit murder.

The state argues that, because the warrant affidavit refers to the signed arrest warrant of the defendant that was issued on facts sufficient to constitute probable cause that the defendant was involved in the shooting of Flemming, the judge issuing the search warrant was entitled to rely on the arrest warrant to establish probable cause. We disagree.

A determination of probable cause for an arrest requires different findings than a determination of probable cause for a search warrant. An arrest warrant requires a finding of probable cause that an offense was committed and that the defendant committed the offense. A search warrant requires a finding of probable cause that the particular items sought to be seized are connected to criminal activity or will assist in a particular conviction and that the items sought to be seized will be found in the place to be searched. "In the case of arrest, the conclusion concerns the guilt of the arrestee, whereas in the case of search warrants, the conclusions go [to] the connection of the items sought with crime and to their present location. This distinction is a critical one, and is particularly significant in search warrant cases, for it means that the probable cause determination in that context is a much more complex matter; the need to determine the probable present location of certain items, for example, gives rise to a question concerning the timeliness of the information which is not ordinarily a matter of concern in arrest cases." (Internal quotation marks omitted.) *State* v. *DeChamplain*, 179 Conn. 522, 529–30, 427 A.2d 1338 (1980); see also *State* v. *Heinz*, 193 Conn. 612, 624, 480 A.2d 452 (1984) ("[B]ecause arrests are inherently less apt to be intrusive than are searches, there is a difference in the constitutional standards by which probable cause to arrest and probable cause to search are measured. The probable cause determination in the context of arrest warrants requires inquiries that are less complex constitutionally than are those that pertain to search warrants.") As we noted previously, "the information to establish probable cause must be found within the affidavit's four corners." *State* v. *Colon*, supra, 230 Conn. 34. The facts related to the defendant's arrest for attempted murder were not included in the search warrant affidavit; nor were the contents of the arrest warrant itself. As such, the search warrant did not contain the factual allegations and evidence that led to the defendant's arrest, which would have enabled the reviewing judge to determine whether those factual allegations would establish probable cause to believe that evidence of an attempted murder existed in the T-Mobile records relating to the defendant's Samsung cell phone. We conclude that the search warrant affidavit did not, on its own, contain enough information for the trial court to determine that probable cause existed for the search.

## B

Next, even if probable cause had been established, the defendant contends that the T-Mobile records search warrant lacked particularity. Although this warrant is markedly different from the Samsung cell phone warrant, for the reasons stated hereinafter, we lack sufficient information to assess the validity of this claim.

The standard of review and governing law for the particularity of a search warrant are detailed previously in part I B of this opinion. Unlike the first warrant, the T-Mobile search warrant particularly described the types of places to be searched and, more specifically, the phone records associated with a "white Samsung cell phone" with the defendant's phone number. Both the warrant and the incorporated affidavit list the crime under investigation—the attempted murder of Flemming—and that the sought after data would assist the investigation.

Importantly, the search warrant requested records only for a limited duration that were reasonably connected to the attempted murder on January 19, 2017. Specifically, the warrant requested such records for between January 7, 2017, at 11:59 p.m., and January 25, 2017, at 11:59 p.m. These dates correlate to approximately one day before the Huang robbery up until the date the defendant was arrested. Additionally, the warrant identified a specific list of items to be searched and seized, including "call records of incoming and outgoing calls, SMS text messages, [e-mail] information and messages, social media messages, video recordings, digital images, voice mail recordings, GPS data, [g]eo-locator, and any other data/information stored on the [device], [i]nternal memory or removable storage media, and/or any data the [device] has access to through a cellular [n]etwork/[Wi-Fi]/Bluetooth connection." These descriptions and time limitation are more likely to satisfy the fourth amendment's particularly requirement. However, given the lack of information in the affidavit relating to the defendant's role in the offense and the device's role in the commission of the offense to establish probable cause to believe that the T-Mobile records would contain evidence of the crime, we are unable to assess the sufficiency of the particularity requirement as it relates to this warrant.

## III

The state next argues that, even if both warrants were improper, any resulting error was harmless. We agree with the state that any error was harmless with respect to the charges concerning the robbery of Huang, the shooting of Flemming, and interfering with an officer. We also conclude, however, that the error was harmful with respect to the charges concerning the robbery and shooting of Chen, the related larceny of the Camry, and the charges related to the arson of the Forester.

We begin with the applicable standard of review. "It is well settled that constitutional search and seizure violations are not structural improprieties requiring reversal, but rather, are subject to harmless error analysis. . . . The harmlessness of an error depends [on] its impact on the trier and the result . . . and the test is whether there is a reasonable possibility that the improperly admitted evidence contributed to the conviction. . . . In determining whether illegally obtained evidence is likely to have contributed to the defendant's conviction, we review the record to determine, for example, whether properly admitted evidence is overwhelming or whether the illegally obtained evidence is cumulative of properly admitted evidence. . . . Simply stated, we look to see whether it is clear beyond a reasonable doubt that the outcome would not have been altered had the illegally obtained evidence not been admitted." (Citations omitted; internal quotation marks omitted.) *State* v. *Esarey*, 308 Conn. 819, 832, 67 A.3d 1001 (2013).

The following evidence was introduced at trial from the Samsung cell phone data extraction search warrant: (1) an extraction summary generated by Cellebrite[14] revealing information such as the cell phone's number and the Facebook account linked to the cell phone;[15] (2) a multimedia message service (MMS) message sent by Gantt to the defendant at 3:11 p.m. on January 22, 2017, which contained an attached photograph of Gantt inside the Shell gas station that the Norwalk police had disseminated to the public in an effort to identify Chen's assailant and the person who set fire to the Forester; (3) a text message sent on January 16, 2017, from the defendant to Gantt in which the defendant told Gantt to watch a report on the news about a robbery and shooting on Rolling Lane (the scene of the Chen shooting); and (4) a text message conversation between the defendant and Gantt that occurred between 6:58 a.m. and 3:52 p.m. on January 14, 2017. In the January 14 conversation, the defendant and Gantt expressed their admiration for one another, and the defendant asked Gantt to "beat the life" out of someone. Gantt also stated, "I'm going to jail," and Gantt made a reference to being in the Milla Death Row gang.

With respect to the search warrant for the records from T-Mobile, the evidence introduced at trial comprised records from T-Mobile that included the dates and times of calls and text messages made from or received by the defendant's cell phone, and the locations of the cell towers utilized by the cell phone. The call records from the defendant's cell phone were provided to James Wines, a special agent within the Federal Bureau of Investigation. Through historical cell site analysis, Wines created a report plotting the approximate location of cell towers and the defendant's cell phone around the times of the various crimes. Wines'

report revealed that the defendant's cell phone activated near the scene of the Chen robbery and shooting in Norwalk, the drive-by shooting and attempted murder of Flemming in Stamford, and the flight from the police officers in Bridgeport. The cell phone did not, however, activate near the scenes of either the Huang robbery in Norwalk or the arson of the Forester in Stamford.

In determining whether an error is harmless beyond a reasonable doubt, various factors are considered, including the importance of the evidence, whether such evidence was cumulative of other evidence, the extent of cross-examination addressing such evidence, and the overall strength of the state's case. See, e.g., *State* v. *Armadore*, 338 Conn. 407, 437, 258 A.3d 601 (2021). To determine whether the evidence obtained from the warrants was cumulative and to evaluate the strength of the state's case against the defendant, we must examine the other evidence admitted at trial.

The state called a cooperating witness, Parker, who testified that he personally observed and participated in the Huang robbery in Norwalk, the drive-by shooting, and the subsequent shooting of Flemming in the convenience store. Parker, however, was not present at and did not testify about the Chen robbery or the arson of the Forester. Parker identified the defendant's role in the robberies and the shootings for which Parker was present. Parker testified that he had served as the getaway driver during the Huang robbery, while Gantt and the defendant committed the robbery, as the defendant was holding a .25 caliber gun. Parker also described the drive-by shooting targeting Flemming and identified the defendant as the one who shot Flemming. He testified that the defendant used the same .25 caliber gun that he had used to commit the robbery of Huang in both of the shooting incidents involving Flemming.

The state also introduced evidence of video footage from the evening Flemming was shot, in which Parker identifed the participants. One video from an apartment complex in Stamford shows Gantt, Parker, Ranero, and the defendant riding together in an elevator approximately one hour before the shooting of Flemming. In that video, the defendant can be seen wearing black shoes, black pants, a black hoodie, a black jacket that appears to have a zippered pocket on the left sleeve, and black gloves. The defendant is also wearing a black "skully,"[16] which was consistent with the black face mask found on the defendant when he was arrested. The other people in the elevator were wearing clothing distinctive from that worn by the defendant. A second video introduced by the state depicts the West Main Street store where Flemming was shot. In that video, Flemming can be seen standing by the counter of the store and wearing pants with reflective stripes on them, which are also visible in a video the state introduced

of Flemming running away from the drive-by shooting. The video depicts a man wearing black shoes, black pants, a black hoodie, a black jacket that appears to have a zippered pocket on the left sleeve, black gloves, and a black ski mask approaching Flemming and shooting him multiple times. In addition to Parker's testimony about the defendant's role as the shooter, the jury was presented with and able to compare the video of the defendant on the elevator with Parker and Gantt about one hour before the shooting with the video of the shooting of Flemming inside the store.

Finally, the state also introduced forensic evidence indicating that .25 caliber shell casings recovered from the scenes of the High Street and 417 West Main Street store shootings in Stamford were fired from the same firearm as shell casings recovered from the January 14, 2017 shooting of Chen in Norwalk.

To begin our analysis, we note that the evidence adduced by the state against the defendant with respect to the Huang robbery was principally derived from Parker's testimony. Neither the CSLI evidence from the defendant's cell phone service provider nor the data recovered from the search of the defendant's phone itself related to that particular offense. As such, we conclude that any error relating to the admission of that evidence was harmless with respect to the charges arising out of that incident.

Second, the video footage from the elevator and the shooting at the store corroborate Parker's testimony related to the shooting of Flemming. See, e.g., *State* v. *Armadore*, supra, 338 Conn. 455–56 (witness' testimony was bolstered by corroborating evidence). The clothing the defendant wore in the elevator was identical to the clothing worn by Flemming's shooter only one hour later. Parker's testimony was further corroborated by the video of Flemming running away from the drive-by shooting. Parker testified that he and the other occupants of the Camry were able to identify Flemming the night of the shooting by the "reflectors on his sweatpants . . . ." The video evidence clearly shows Flemming wearing clothing matching that description, giving credence to Parker's testimony about the events that evening.

Further, the state established a motive for the shootings by introducing evidence that the Milla Death Row gang, of which the defendant was a member, had a "beef" with Flemming. Therefore, we conclude that the state has met its burden of establishing that the trial court's admission of the evidence obtained from the two search warrants, including the CSLI and the data extracted from the cell phone, was harmless beyond a reasonable doubt with respect to the shootings of Flemming.

Third, the charge of interfering with an officer, in

connection with events that had occurred on January 25, 2017, was clearly unaffected by the search warrants because Stamford police officers discovered the defendant as a passenger in the stolen Camry and witnessed him attempt to evade police capture. Moreover, the defendant's fingerprints were discovered on the right rear passenger door of the Camry. It is highly unlikely that the defendant's CSLI putting him in the area where the stolen Camry was stopped would have affected the jury's decision with respect to the charge of interfering with an officer in light of the fact that the police apprehended him after he exited that car.

On the other hand, we find that, insofar as the CSLI was the only evidence placing the defendant at the scene of the Chen robbery and assault, the state has not met its burden of proving that the admission of that evidence was harmless beyond a reasonable doubt with respect to those crimes. Parker testified that he was not at the scene of the Chen robbery on January 14, 2017, and, thus, gave no account of who was present or what occurred. The CSLI is the key, if not the only evidence, placing the defendant at the scene of the Chen robbery, assault, and the subsequent arson of the Forester. The state claims that other evidence serves to prove that the defendant was involved in that scheme, including an argument that the scheme was almost identical to the Huang robbery, Chen's testimony that two perpetrators were involved, the fact that the shell casings were identical to those found at the scene of the Flemming shooting, and the fact that the defendant was found with Gantt in the stolen Camry. Although those pieces of evidence could have influenced the jury's findings, the defendant's CSLI was the most concrete and direct evidence placing the defendant at the scene of those crimes. Accordingly, we cannot conclude that the jury's determination of guilt with respect to either the robbery and assault of Chen, or the subsequent larceny of the Camry, was uninfluenced by the CSLI evidence.

This same logic extends to the arson of the Forester. The evidence offered by the state at trial tends to show that the perpetrators of the crimes against Chen drove directly to the Shell gas station, then set the Forester ablaze. Although Parker was able to identify Gantt in the gas station video footage, there was no identification of the defendant in that video. The omission of the defendant's CSLI from the state's case significantly weakens the evidence tending to show that the defendant was at the scene of the Chen robbery and, thus, also reduces the certainty that he was involved in the subsequent arson relating to the Forester.

For the foregoing reasons, we affirm the defendant's conviction of (1) robbery in the first degree and conspiracy to commit robbery in the first degree for the robbery of Huang in Norwalk on January 9, 2017, (2) two counts of attempt to commit murder and one count of conspir-

acy to commit murder for the January 19, 2017 shooting incidents in Stamford involving Flemming, and (3) interfering with an officer in connection with the defendant's flight from the police on January 25, 2017.

We also conclude, however, that the CSLI evidence from the service provider warrant was harmful with respect to the defendant's conviction of (1) robbery in the first degree, conspiracy to commit robbery in the first degree, and assault in the first degree for the robbery and shooting of Chen in Norwalk, (2) larceny in the third degree for the related theft of the Camry, and (3) arson in the second degree and conspiracy to commit arson in the second degree for the defendant's involvement with setting the Forester on fire.[17]

The judgment of conviction of robbery in the first degree, conspiracy to commit robbery in the first degree, and assault in the first degree in the case involving the robbery and shooting of Chen, and the judgment of conviction of arson in the second degree and conspiracy to commit arson in the second degree in the case involving the burning of the Forester are reversed, the judgment of conviction in the case involving the events of January 25, 2017, is reversed with respect to the conviction of larceny in the third degree, and the case is remanded for a new trial with respect to only those offenses; the judgment of conviction of two counts of attempt to commit murder and one count of conspiracy to commit murder in the case involving the shootings of Flemming and the judgment of conviction of robbery in the first degree and conspiracy to commit robbery in the first degree in the case involving the robbery of Huang are affirmed, and the judgment of conviction in the case involving the events of January 25, 2017, is affirmed with respect to the conviction of interfering with an officer.

In this opinion the other justices concurred.

[1] The judgments of conviction in the present case arose from a consolidated trial of five related criminal proceedings against the defendant. In the first case, which arose out of a robbery in Norwalk on January 9, 2017, the defendant was convicted of robbery in the first degree in violation of General Statutes §§ 53a-8 (a) and 53a-134 (a) (4) and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (4). In the second case, which related to a second robbery in Norwalk on January 14, 2017, the defendant was convicted of robbery in the first degree in violation of §§ 53a-8 (a) and 53a-134 (a) (1), conspiracy to commit robbery in the first degree in violation of §§ 53a-48 (a) and 53a-134 (a) (1), and assault in the first degree in violation of General Statutes §§ 53a-8 (a) and 53a-59 (a) (1). In the third case, which followed the discovery of a burned-out motor vehicle in Stamford shortly after the second robbery, the defendant was convicted of arson in the second degree in violation of General Statutes §§ 53a-8 (a) and 53a-112 (a) (1) (B) and conspiracy to commit arson in the second degree in violation of §§ 53a-48 (a) and 53a-112 (a) (1) (B). In the fourth case, which arose out of the shootings in Stamford on January 19, 2017, the defendant was convicted of two counts of attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a, and one count of conspiracy to commit murder in violation of §§ 53a-48 (a) and 53a-54a. Finally, in the fifth case, which related to the defendant's presence in a stolen vehicle and subsequent flight from the police in Bridgeport on January 25, 2017, the defendant was convicted of larceny in the third degree in violation of General Statutes §§ 53a-8 (a) and

53a-124 (a) (1) and interfering with an officer in violation of General Statutes § 53a-167a (a).

[2] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The fourth amendment's guarantee against unreasonable searches and seizures is made applicable to the states through the due process clause of the fourteenth amendment. *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

[3] The Milla Death Row gang is a self-identifying faction within the larger Bloods enterprise.

[4] The homeowner of 3 Rolling Lane in Norwalk testified that, at approximately 7 p.m. on January 9, 2017, she observed a "red Subaru Forester" parked near her house.

[5] Flemming was a member of the High Street gang, also known as the Project Boys, which is aligned with the Crypts.

[6] At approximately 6:45 p.m., Stamford police responded to 34 High Street after reports of "shots fired, with a black male running, with dreads . . . south on High Street across West Main Street." Further, video surveillance footage of the vicinity of 34 High Street captured "a four door dark colored sedan" with "an orange plate, believed to be a New York plate" moments before the shooting.

[7] The sentence broke down as follows: (1) twenty years for each of the attempt to commit murder counts and twenty years for the conspiracy to commit murder count, to run concurrently with each other; (2) ten years followed by ten years of special parole for the assault of Chen, and ten years for the robbery and conspiracy to commit robbery of Chen, to run concurrently with the assault sentence but to run consecutively to the sentence imposed for the attempt to commit murder counts; (3) five years for the larceny of the Camry and one year for interfering with an officer, to run concurrently with each other and concurrently with the other sentences imposed; (4) five years each for the robbery and conspiracy to commit robbery of Huang, to run concurrently with each other but consecutively to the sentences previously imposed; and (5) ten years each for arson and conspiracy to commit arson, to run concurrently with each other and concurrently with the other sentences imposed.

[8] Only the search of the white Samsung phone is at issue in this appeal.

[9] "Facebook Live is a feature of Facebook, an online social networking platform, that allows users to '[g]o live on Facebook to broadcast a conversation, performance, Q & A or virtual event.' " *State* v. *Segrain*, 243 A.3d 1055, 1059 n.8 (R.I. 2021), quoting Meta, Facebook Live, available at https://www.facebook.com/formedia/solutions/facebook-live (last visited July 29, 2022). This feature allows users to livestream directly to the social network platform and allows viewers to comment or otherwise react to the stream. A recording of the video will be posted to the user's page or profile and can be viewed later. See *United States* v. *Westley*, Docket No. 3:17-CR-171 (MPS), 2018 WL 3448161, *4 n.2 (D. Conn. July 17, 2018) ("Facebook Live is a feature provided by Facebook that allows users to share live video with their followers and friends on Facebook. After the live video ends, the video is published to the user's profile so that the user's Facebook friends can watch it at a later time.").

[10] A recorded Facebook Live video of Gantt and the defendant was introduced at trial. Because the warrant lacks any detail about the Facebook Live video, it is not clear whether the warrant referred to the same video that was ultimately admitted into evidence. At trial, the state offered a recording of a Facebook Live video posted on Gantt's Facebook page, which depicts Gantt and the defendant walking together in Bridgeport within an hour of the shooting of Flemming. In that video, Gantt and the defendant are singing and speaking to a virtual audience. Officer Nicholas Gentz, who was monitoring Gantt's Facebook account shortly after the shooting of Flemming, testified about the content of the posting and his knowledge of the feud between the victim and the defendant's group. On the basis of his expertise and knowledge, he explained that Gantt and the defendant were talking about having been with the opposing group, or their "ops," and having done something to them.

[11] Such affidavits should generally contain, at a minimum, a description of the device's role in the offense and a summary of the relevant technology.

See, e.g., Regional Computer Forensic Laboratory, Cellphone (Mobile Device) Search Warrant Affidavit (July 17, 2018) pp. 2, 4–5, available at https://www.rcfl.gov/north-texas/documents-forms/sample_app_mobile_device.pdf (last visited July 29, 2022). That statement would necessarily describe whether the electronic device was evidence of a crime, contraband, or an instrumentality of the crime in and of itself, and/or whether it contained data falling within one of those descriptions. Id., pp. 4–5. When appropriate and accurate, a law enforcement officer may state that such devices are frequently used by persons engaged in the particular type of criminal conduct alleged. Id., p. 5; see also, e.g., *State* v. *Sayles*, 202 Conn. App. 736, 764, 246 A.3d 1010 (probable cause to seize cell phone was partially based on police officer's general knowledge that coconspirators "often communicate with one another via cell phone, and that these devices may contain evidence that can connect a person to a crime, such as call logs, text messages and GPS data"), cert. granted, 336 Conn. 929, 247 A.3d 578 (2021).

[12] According to the CTIA's 2021 annual survey, the trend of pervasive cell phone use continues to increase. Indeed, "American consumers have continued to use wireless networks to stay connected, especially while social distancing—we exchanged over 119 billion more messages last year, for a total of 2.2 trillion SMS and MMS messages, driven by a 28 [percent] increase in GIFs, memes, videos, and other MMS messages. Voice traffic saw 2.9 trillion minutes of use." CTIA, 2021 Annual Survey Highlights (July 27, 2021), available at https://www.ctia.org/news/2021-annual-survey-highlights (last visited July 29, 2022). The same report also noted that "[m]obile wireless data traffic had another record year, topping 42 trillion [megabytes]—a 208 [percent] increase since 2016. Over the past decade, Americans have driven a 108 [times] increase in mobile data traffic." Id.

[13] During oral argument, the state acknowledged that a team had been developing protocols to provide law enforcement with guidance on particularity requirements for cell phone warrants. Additional guidance available to law enforcement recommends that warrants contain information about the "exact brand and model of the device," if they are known, and "tailor a description of its specific capabilities," and indicates that such "information is [often] available from the manufacturer or [online]." See, e.g., Regional Computer Forensic Laboratory, Cellphone (Mobile Device) Search Warrant Affidavit (July 17, 2018) p. 2, available at https://www.rcfl.gov/north-texas/documents-forms/sample_app_mobile_device.pdf (last visited July 29, 2022). If the specific identity of the cellular device is not available, there are generic descriptions that can be used to describe the typical capabilities of cell phones. See id., pp. 2–3 (The use of the following generic description is suggested "as necessary depending on [the] target of warrant . . . [for a cell phone] . . . . A [cell phone] or mobile telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called 'cells,' enabling communication with other [cell phones] or traditional 'land line' telephones. A [cell phone] usually includes a 'call log,' which records the telephone number, date, and time of calls made to and from the phone. . . . In addition to enabling voice communications, [cell phones] now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic 'address books;' sending, receiving, and storing text messages and [e-mail]; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. [Cell phones] may also include global positioning system . . . technology for determining the location of the device.").

[14] Cellebrite software was used to extract data from the defendant's cell phone and categorized it into separate "container file[s]" by placing, for example, text messages into a text messages folder and call logs into a call logs folder. Once the data is categorized, the police can then search the files to "see what's on the phone."

[15] A Facebook account for "Shellz Row" was linked to the phone.

[16] Parker testified that a "skully" is a ski mask, which would cover the wearer's face, that can be rolled up into a hat that would not obscure the wearer's face. In the video footage from the elevator, the defendant is wearing his skully rolled up into a hat.

[17] In its brief, the state asserts that the present case should be remanded for a hearing on the inevitable discovery and independent source exceptions to the exclusionary rule. We disagree. Although it may be true that "much of the challenged information could have been obtained through search

warrants for the codefendants' phones," that argument cannot logically be extended to the defendant's own CSLI. There was no testimony from Parker or other witnesses that placed the defendant with the codefendants on the date of or at the scene of the Chen robbery and assault, or the arson. Cf. *State* v. *Tyus*, 342 Conn. 784, 805, 272 A.3d 132 (2022) (CSLI of codefendant was admitted into evidence when defendant and codefendant admitted to being together entire evening during which crime was committed). The state's assertion that the Norwalk Police Department would have, at some indeterminate point in the future, obtained a lawful warrant in the course of its own investigation is likewise unavailing. Accepting such a bare argument, without more, would render the protections afforded by the warrant requirement largely illusory.

This court has, on occasion, remanded a case for a hearing related to the application of these exceptions in cases in which the trial court or the parties could not have raised a claim under those doctrines and they are raised for the first time on appeal. See, e.g., *State* v. *Correa*, 340 Conn. 619, 635–36, 639, 264 A.3d 894 (2021). The claim the state now raises, however, does not fall under the auspices of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The state had an adequate opportunity to assert a factual basis for the applicability of these doctrines in responding to the defendant's motion to suppress the evidence that was obtained pursuant to the warrants. Its decision to forgo that opportunity obviates the need for a more limited remand.

———————————————————