# STATE OF CONNECTICUT *v.* SERGIO J. CORREA
## (SC 20728)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander and Dannehy, Js.

*Syllabus*

Convicted of murder with special circumstances, home invasion, arson in the second degree, and robbery in the first degree in connection with the planned invasion and robbery of the home of the murder victims, M, K and J, the defendant appealed to this court. Shortly before the crimes occurred, the defendant texted with M, K and J's son, in order to plan a robbery whereby M would help the defendant steal K's gun safe and guns, which were located in the family home, in exchange for drugs and money. When the defendant and his sister, R, arrived in the area of the victims' home, they met with M and killed him in a nearby wooded area. Subsequently, the defendant and R entered the victims' home, where the defendant killed K and J. The defendant and R remained in the home and stole various items and then set the home on fire. Prior to the defendant's arrest, the police interviewed the defendant, immediately after which they seized his cell phone without a warrant. The police later obtained a warrant to search and seize "all data" from the defendant's cell phone, "including, but not limited to, all call logs . . . [t]ext messaging, telephone numbers stored, address book, calendar, email, video files, and graphic files." The warrant did not identify any temporal parameters within which to limit the search. An extraction of the data from the cell phone yielded, among other information, global positioning system (GPS) data, text message communications the defendant

353 Conn. 338　　SEPTEMBER, 2025　　339

State *v.* Correa

had with, among others, R and T, the defendant's girlfriend, and certain photographs and Internet searches suggesting that the defendant had researched how to break into a gun safe. Before trial, the defendant moved to suppress all evidence obtained from his cell phone, contending that the police had illegally seized his cell phone and that the warrant was unconstitutional because it permitted the police to search and seize "all data" from his cell phone without temporal limitations. In a pretrial ruling on the motion to suppress, the trial court concluded that the seizure of the cell phone was proper, and, applying the doctrine of severance, the court also concluded that the police had probable cause to search the defendant's cell phone for data created or received during the approximately two week period leading up to the date of the crimes. Accordingly, the court concluded that these data were admissible but suppressed any data created or received outside of the two week period. On appeal, the defendant claimed, inter alia, that the warrant to search and seize "all data" from his cell phone violated his rights under the fourth amendment to the United States constitution. *Held*:

This court assumed, without deciding, that the warrantless seizure of the defendant's cell phone was constitutional, determined that the warrant to search the cell phone violated the fourth amendment because the warrant lacked particularity and that the trial court erred in applying the severance doctrine under the circumstances of this case, but concluded that any error was harmless beyond a reasonable doubt and, therefore, affirmed the judgment of conviction.

Although the warrant properly identified the offenses for which the police had established probable cause by incorporating by reference the warrant application and the accompanying affidavit, which listed those specific offenses, the warrant's failure to limit what could be searched or seized by content and by time ran afoul of the fourth amendment's particularity requirement.

Specifically, the warrant's authorization to search and seize "all data" from the defendant's cell phone failed to identify, and therefore limit, the specific data to be searched and seized or to explain how that data related to the alleged offenses, and the state could not prevail on its claim that the phrase "including, but not limited to," placed a meaningful limit on the authorization to search and seize "all" of the cell phone's data.

Moreover, the state could not prevail on its claim that the warrant was sufficiently particular given that the technology to conduct a targeted extraction of the defendant's cell phone's data was not available when authorities conducted the extraction, as certain investigators testified that they had the technological capability to limit by content type and time the human-readable report generated from the extraction procedure.

The trial court improperly applied the severance doctrine in seeking to cure the warrant's deficiencies, as there was no constitutional portion of the

State *v.* Correa

warrant that could remain after severing the constitutionally infirm portion, and, although the court purported to apply the severance doctrine when it added to the warrant a temporal limitation that did not previously exist, the severance doctrine authorizes a court only to salvage the constitutional portion of a warrant, not to make an insufficiently particular warrant sufficiently particular.

Nevertheless, the trial court's error in admitting the data extracted from the defendant's cell phone, pursuant to an unconstitutional warrant, was harmless beyond a reasonable doubt.

The state's case against the defendant, independent of the cell phone evidence, was strong, the cell phone evidence was largely cumulative of properly introduced evidence, the cell phone evidence was neither critical to the state's case nor greatly emphasized relative to the other evidence, and, accordingly, this court was not persuaded that the improper admission of the cell phone evidence contributed to or substantially affected the jury's verdict.

Argued March 5—officially released September 16, 2025

*Procedural History*

Substitute information charging the defendant with three counts each of the crimes of murder and felony murder, two counts each of the crimes of arson in the second degree and robbery in the first degree, and one count each of the crimes of murder with special circumstances, arson murder, burglary in the first degree and home invasion, brought to the Superior Court in the judicial district of New London, where the court, *Kwak, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the case was tried to the jury before *Kwak, J.*; verdict of guilty of three counts of murder, two counts each of felony murder, arson in the second degree and robbery in the first degree, and one count each of murder with special circumstances, arson murder, burglary in the first degree and home invasion; subsequently, the court vacated the conviction of three counts of murder, two counts of felony murder, and one count each of arson murder and burglary in the first degree and rendered judgment of guilty of two counts each of arson in the second degree and robbery in the first degree and one count each of murder with

353 Conn. 338 SEPTEMBER, 2025 341

State *v.* Correa

special circumstances and home invasion, from which the defendant appealed to this court. *Affirmed.*

*Jennifer B. Smith*, assistant public defender, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Paul Narducci*, state's attorney, *Stephen Carney*, supervisory assistant state's attorney, and *Thomas DeLillo* and *Marissa Goldberg*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

McDONALD, J. This appeal requires us to examine, among other things, the level of particularity required for a warrant to search and seize a cell phone's data. The defendant, Sergio J. Correa, appeals from the judgment of conviction, rendered after a jury trial, of one count of murder with special circumstances, two counts of arson in the second degree, two counts of robbery in the first degree, and one count of home invasion. He claims that his rights under the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution were violated when the police (1) seized his cell phone without a warrant, and (2) obtained a warrant to search and seize "all data" on the cell phone. Assuming the seizure of the defendant's cell phone was constitutional, we conclude that the warrant violated the fourth amendment because it was insufficiently particular. Accordingly, the evidence obtained from the defendant's cell phone should have been suppressed. However, we affirm the trial court's judgment of conviction because we conclude that the error was harmless beyond a reasonable doubt.

I

The jury could have reasonably found the following facts.[1] Matthew Lindquist was in his twenties and lived

[1] Because we conclude that the data extracted from the defendant's cell phone should have been suppressed, the facts that follow make no reference to the evidence the state presented at trial that derived solely from the

State *v.* Correa

with his parents, Kenneth Lindquist and Janet Lindquist, in their house in Griswold. He had been struggling with a drug addiction and hoped to sell certain items so that he could purchase more drugs with the money he made. Beginning in December, 2017, Matthew sent a series of text messages to the defendant on the TextNow application. Matthew asked the defendant whether he would purchase various items, including Kenneth's gun safe, a television, and Matthew's car, a 2003 Saturn Ion, in exchange for money and drugs. After some back-and-forth over many days, the defendant expressed interest in purchasing the gun safe from Matthew in exchange for heroin and cash. Matthew agreed, and he and the defendant devised a plan to sneak into the Lindquists' house on December 19 and to steal the gun safe from the basement.

That day, Matthew also informed the defendant that there were at least two guns inside the safe but that he had no way to unlock it. The defendant replied that he would find the lock specifications and learn how to unlock it. The defendant later texted Matthew that he "stole what it takes to open it." Matthew proposed that they meet at a nearby Walmart that evening. The defendant declined because there were "[t]oo many cameras" and the car—a white 2003 Mitsubishi Galant—was "registered to [the defendant].''[2] The defendant and Matthew agreed to meet near the Lindquists' house instead.

improperly obtained cell phone data. All references to the defendant's messages refer to messages sent over the TextNow messaging application—which were lawfully obtained—or testimony by recipients concerning messages sent by the defendant. TextNow is a third-party voice over Internet application that, as the trial court noted in its posttrial memorandum of decision addressing the defendant's pretrial motion to suppress, provides "a number [that is] unique . . . and distinct from one's actual telephone number."

[2] Other testimony and documentary evidence established that the defendant and his girlfriend co-owned the Mitsubishi Galant and that it was registered in both of their names.

State *v.* Correa

That evening, the defendant asked his sister, Ruth Correa, to drive him to Griswold in his car. The defendant picked up Ruth at her apartment in Hartford that night, and Ruth drove them to Griswold while the defendant provided directions from his cell phone using its global positioning system (GPS) function. Video footage from the SANA Apartments, where the defendant and Ruth both lived, shows Ruth leaving her apartment with a large knife tucked into her jeans. Cell site location information (CSLI) indicated that the defendant and Ruth left Hartford around 11:30 p.m., traveled along Route 2, and arrived in Griswold around one hour later. At 12:32 a.m., the defendant texted Matthew: "Just got here."

Ruth parked the car in a cul-de-sac, near a wooded area in the Lindquists' neighborhood. Matthew approached and sat in the backseat area of the car. The defendant and Matthew discussed their plan to steal the gun safe and guns from the Lindquists' house, make it look like a break-in, and to blame someone else. The defendant then showed Matthew what appeared to be a bag of drugs. For reasons that are not clear from the record, Matthew became "fidgety" and abruptly left the defendant's car and ran into the nearby woods. The defendant chased Matthew and hit him in the back of the head with a machete, which the defendant regularly kept in his car. Matthew fell to the ground. The defendant, and shortly after, Ruth, repeatedly stabbed Matthew until he stopped moving. The defendant covered up Matthew's body with brush. The state medical examiner who later conducted the autopsy concluded that Matthew had at least sixty-seven sharp force injuries, including "a chop type wound [in] the back of [his] head," likely caused by a "heavy" and "sharp cutting implement," that fractured his skull. Based on Matthew's injuries, the medical examiner concluded that Matthew died by homicide.

State *v.* Correa

The defendant and Ruth returned to the defendant's car. The defendant grabbed a baseball bat, Ruth grabbed a golf club, and they headed toward the Lindquists' house. They entered the back of the house through an open basement door. The defendant located the gun safe in the basement and attempted to open it and retrieve the guns, but he was unable to break into the safe. After he noticed that he also could not remove the gun safe from the basement because it was bolted to the floor, he realized that he needed a key to open it. The defendant and Ruth proceeded to walk up the basement stairs and entered the living room. Their movement woke up Kenneth, who had been sleeping on a couch in the living room. After Kenneth screamed for them to get out, the defendant struck him in the head and body with the baseball bat. In response to the commotion, the Lindquists' dog and Janet entered the living room. The dog began barking at the defendant and Ruth. Ruth hit the dog on its head with the golf club, and the dog ran away whimpering. The defendant then instructed Ruth to take Janet away to another room. While moving Janet to Matthew's room, Ruth could hear cracking noises caused by the defendant's repeated blows to Kenneth's head. Eventually, "[i]t got quiet," and Ruth could no longer hear the defendant and Kenneth "tussling anymore." The state medical examiner who later conducted Kenneth's autopsy observed that Kenneth had multiple fractures to his skull, indicating significant blunt force trauma. Based on Kenneth's injuries, the medical examiner concluded that he died by homicide.

The defendant entered Matthew's room and told Ruth to take Janet to the master bedroom. He then rummaged through the Lindquists' house in search of items to steal while Ruth guarded Janet. The defendant returned and began looking for items in the bedroom. He also told Ruth "[t]o go look for stuff." After searching the house,

State *v.* Correa

Ruth stuffed various items into a garbage bag, including towels, bedsheets, and wrapped Christmas presents. The defendant and Ruth also stole a purple laptop, Kenneth's computer monitor, cash, jewelry, and the Lindquists' cell phones, among other things.

At some point after gathering items from the house and opening the gun safe,[3] the defendant returned to the master bedroom. He pointed a "long and brown" gun at Janet and told Ruth "to take care of her." Ruth refused, so the defendant grabbed the baseball bat and began hitting Janet on the head. Because it appeared that Janet was still alive after many blows to the head, the defendant found a shoelace and began strangling Janet with it until she stopped moving. The defendant and Ruth then grabbed the stolen items and carried them outside to Matthew's car, which was parked near the garage. After multiple trips, they finished placing the stolen items in the back seat of Matthew's car.

The defendant instructed Ruth to help him find "something flammable." They found metal cans containing flammable liquids and poured them throughout the basement, the basement stairs, and the living room. The defendant then lit an exercise ball on fire in a hallway, and he and Ruth fled the house. Once outside, the defendant instructed Ruth to find something with which to wipe down the door handles and interior of Kenneth's truck, where Ruth had found one of the metal cans, in order to remove any fingerprints. Ruth did so, while the defendant entered Matthew's car. The defendant then drove Ruth in Matthew's car to the defendant's car, which was still parked in the cul-de-sac. Video

_____

[3] Ruth did not testify that the defendant broke into the gun safe. It is reasonable, however, for the jury to have inferred that he successfully broke into the safe because (1) the defendant and Ruth did not have a gun with them when they entered the Lindquists' house, (2) the defendant pointed a gun at Janet, indicating that he obtained the gun from the house, and (3) investigators subsequently observed that the safe was open.

State *v.* Correa

footage from a neighbor's outdoor camera showed a vehicle with its lights on pulling into the cul-de-sac around 4:16 a.m. The footage also shows what appears to be another vehicle turn on its lights and drive away seconds later. The defendant drove away in Matthew's car, and Ruth followed in the defendant's car. Ruth testified that, in total, she and the defendant were inside the Lindquists' house for at least a "[c]ouple [of] hours." CSLI indicated that the defendant's cell phone was in the area near the Lindquists' house from approximately 12:30 to 4:30 a.m.

A neighbor awoke around 5:20 a.m. to a "bright orange" bedroom and noticed that the Lindquists' house was engulfed in flames. The neighbor's wife called 911, and emergency responders subsequently arrived at the house. The state medical examiner who later conducted Janet's autopsy observed that she had multiple fractures to her skull, indicating significant blunt force trauma. However, because the examiner detected a significant amount of carbon monoxide in Janet's blood, she concluded that Janet died not only from "homicidal violence, including blunt trauma of the head," but also from "smoke inhalation and thermal injuries." Fire investigators concluded that the fire was caused by human intervention.

The defendant and Ruth drove back toward Hartford. After driving a short time, the defendant exited Route 2, and Ruth followed. They found an "abandoned business building" and transferred all the items from Matthew's car to the defendant's car. The defendant continued to drive toward Hartford, and Ruth followed. The defendant later exited in Glastonbury, drove for a few minutes, and stopped to tell Ruth to wait for him. The defendant then drove Matthew's car a short distance to Nanel Drive in Glastonbury, where he parked Matthew's car and set it on fire. The defendant came jogging back to

State *v.* Correa

where Ruth was parked and entered the defendant's car. Ruth then drove them to Hartford.

Video footage from a bank showed vehicles consistent with Matthew's car and the defendant's car traveling close together on the New London Turnpike in Glastonbury at approximately 5:41 a.m. The video shows two cars traveling together, and then one car traveling alone toward Nanel Drive. The video shows what appears to be a flame erupt on Nanel Drive at 5:47 a.m., and, at 5:49 a.m., a car consistent with the defendant's car can be seen leaving the area. CSLI indicates that the defendant's cell phone and Matthew's stolen cell phone connected to multiple cell towers in the Glastonbury area between 5:30 and 5:53 a.m.

After setting Matthew's car on fire, the defendant and Ruth finished their drive to Hartford. Ruth parked close to train tracks that were near the SANA Apartments. The defendant and Ruth divided up the stolen goods into two separate bags. CSLI indicates that the defendant's and Matthew's cell phones were located near the SANA Apartments around 6:28 a.m. Over the next few hours, phone activity on Janet's and Kenneth's cell phones indicated that their cell phones were also located near the SANA Apartments. Shortly after 7 a.m., Ruth sent Facebook messages to a friend, saying "[j]ust now getting home" and that everything went "[a]ccording to plan." Later that day, the friend asked, "what you did," to which Ruth replied, "[t]oo much."

Later that morning, the defendant drove his car to a school that was located close to the SANA Apartments, where he met his girlfriend, Tanisha Vicento. The defendant was with Tanisha when she went to sleep the night before, but, when she woke up, he was gone. When she saw him that morning, he seemed "excited" and was wearing different clothes than the night before. The defendant opened the trunk of his car and showed Tani-

State *v.* Correa

sha "[a] black bag full of Christmas bags and a wolf blanket," "[c]oins," and two "[b]ig, long" guns. Tanisha observed that the items in the trunk were not "there before." Later that day, Tanisha went to Ruth's apartment. She observed that Ruth also had many items she had not seen before, including hair products, a purple laptop, a computer monitor, jewelry, a heated blanket, coins, and a hair straightener.

Meanwhile, the police were dispatched to the fire at the Lindquists' house around 5:10 a.m. A neighbor told the police that Matthew's car had been parked in the Lindquists' driveway the night before but was no longer there in the morning. The Connecticut State Police Fire and Explosion Investigation Unit later arrived to investigate, and it eventually discovered the charred remains of Kenneth and Janet. Within a few hours, the police had determined that the car that had been set on fire in Glastonbury belonged to Matthew. But the police could not locate Matthew.

Investigators quickly learned that Matthew had a drug addiction and had a strained relationship with Kenneth and Janet. As a result, the police initially considered Matthew a suspect. Because Matthew's car was also missing the morning after the house fire, the police sent an exigent circumstance form to Sprint, seeking information about Matthew's cell phone location, which they could use to determine his likely location. Sprint provided CSLI, which indicated that Matthew's cell phone was located near Donald Street in Hartford, close to the SANA Apartments. Sprint also provided a call log that listed calls between Matthew's cell phone number and other phone numbers during the prior two days. Law enforcement used this information to identify the phone number most frequently in contact with Matthew's cell phone number, which they determined was associated with a TextNow account. Pursuant to an emergency request, TextNow provided the police with

State *v.* Correa

the email address associated with the account. An agent with the Federal Bureau of Investigation (FBI) then connected the email address to the defendant through an open-source search. Subsequently, the police lawfully obtained a warrant to search all messages between the defendant and Matthew that were sent through the TextNow application.

The police went to the defendant's residence on December 28, 2017, accompanied by probation officers. After the probation officers lawfully searched the defendant's residence, the defendant agreed to speak with the police at the police station. During the interview, the police questioned the defendant about Matthew's whereabouts. The defendant denied knowing where Matthew was and, after further questioning, asked for an attorney. At the end of the interview, the police seized the defendant's cell phone out of fear that he would destroy evidence on it that related to the crimes. The police also seized his car. The police found Kenneth's computer monitor in the back seat of the defendant's car. Subsequent forensic analysis detected the defendant's DNA on the monitor. After inspecting the car, the police observed that the front seats in the defendant's car were not completely bolted to the floor, indicating that they had been modified. Tanisha later confirmed that the defendant had changed the material covering the seats in his car from cloth to leather "a few days before Christmas."

Five months later, as winter yielded to spring, the Lindquists' neighbor was walking his dog and discovered what turned out to be Matthew's body in a wooded area, close to the Lindquists' house. Shortly thereafter, the police obtained warrants to search the defendant's and Ruth's residences and brought in Ruth and Tanisha for an interview at the police station. Ruth confessed that she and the defendant had killed Matthew and that the defendant had killed Kenneth and Janet. Tanisha

State *v.* Correa

told the police that the defendant had confessed to her that he had killed "the dad" and that Ruth had killed "the mom." The police obtained a warrant to search and seize "all data" on the defendant's cell phone, which they had previously seized in December, 2017. The defendant was arrested in June, 2018.

The state charged the defendant with one count of murder with special circumstances in violation of General Statutes § 53a-54b (7), three counts of murder in violation of General Statutes § 53a-54a (a), three counts of felony murder in violation of General Statutes § 53a-54c, two counts of arson in the second degree in violation of General Statutes § 53a-112 (a) (1) (B), one count of arson murder in violation of General Statutes § 53a-54d, one count of burglary in the first degree in violation of General Statutes § 53a-101 (a) (3), two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (1), and one count of home invasion in violation of General Statutes § 53a-100aa (a) (2). Before trial, the defendant moved to suppress any evidence obtained from his cell phone, arguing that the police illegally seized his cell phone and that the warrant was unconstitutional because it permitted the police to search and seize "all data" on his cell phone, without a time limit. The trial court concluded that the seizure of the cell phone was proper. Applying the doctrine of severance, the court also concluded that the police had probable cause to search the defendant's cell phone for data created or received between December 6 and December 20, 2017, inclusive. Accordingly, the trial court concluded that this data was admissible at trial but suppressed all evidence outside of these dates.

During closing argument, defense counsel principally argued that Ruth's and Tanisha's testimony lacked credibility. Counsel also claimed that an unknown third party may have been involved in the murders and other crimes. The jury found the defendant not guilty of one

State *v.* Correa

count of felony murder in violation of § 53a-54c. But it returned a guilty verdict as to the remaining thirteen counts. The trial court vacated three counts of murder in violation of § 53a-54a (a), one count of arson murder in violation of § 53a-54d, two counts of felony murder in violation of § 53a-54c, and one count of burglary in the first degree in violation of § 53a-101 (a) (3). The judge sentenced the defendant to a total effective sentence of life imprisonment without the possibility of release. This direct appeal followed. Additional facts and procedural history will be set forth as necessary.

II

We first consider the defendant's claim that the warrant issued to seize and search "all data" on his cell phone violated the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution.[4]

The following additional facts and procedural history are relevant to our analysis. Approximately six months after the warrantless seizure of the defendant's cell phone, the police obtained a warrant to search and seize the cell phone's data. The warrant described the defendant's cell phone, which was an iPhone, including the make, model number, serial number, and corresponding telephone number. It then requested, in relevant part, "all data contained therein . . . including, but not limited to, all call logs of calls placed and received, [short message service (SMS)] and [multimedia message service (MMS)] [t]ext messaging, tele-

---

[4] Because the defendant did not brief a separate state constitutional claim and does not claim that article first, § 7, of the Connecticut constitution affords greater protection than the fourth amendment to the United States constitution under these circumstances, we do not separately consider the defendant's state constitutional claim. See, e.g., *State* v. *Mark T.*, 339 Conn. 225, 228 n.1, 260 A.3d 402 (2021); *Young* v. *Commissioner of Correction*, 219 Conn. App. 171, 183–84 n.7, 294 A.3d 29, cert. denied, 347 Conn. 905, 297 A.3d 567 (2023).

State *v.* Correa

phone numbers stored, address book, calendar, email, video files, and graphic files.'' The warrant did not identify any time parameters to limit the search of the defendant's cell phone. Although the warrant itself did not identify the specific offenses for which the police had probable cause, the affidavit and application listed, ''[a]rson [first] . . . and [f]elony [m]urder . . . .''

The affiants made the following factual assertions in the affidavit. While investigating the fire at the Lindquists' house and seeking to determine Matthew's location, the police learned that the defendant had frequently communicated with Matthew shortly before the fire occurred. When investigators '' 'pinged' '' Matthew's cell phone, they found out that it was located near the defendant's residence in Hartford. After the police interviewed the defendant, they searched his car and discovered ''a red gas can . . . multiple knives, a bottle of wound cleanser spray, a small sledgehammer . . . [and] a black HP brand computer monitor . . . .'' The affidavit provided TextNow messages between the defendant and Matthew that were sent during the three days prior to Matthew's death. The messages indicated that the defendant expected Matthew to assist him in stealing a gun safe and guns from the Lindquists' house in exchange for providing him with drugs and money. They further indicated that the defendant arrived at the Lindquists' house around 12:30 a.m. on December 20, 2017.

The affiants asserted that postmortem reports indicated that Kenneth, Janet, and Matthew died by homicide. They further stated that Ruth had confessed that she and the defendant had killed all three of the Lindquists and had set their house on fire. Based on their ''training and experience,'' the police affiants averred that searching a suspect's cell phone would allow them to identify ''the actual owner of the [cell phone], who may have been using the [cell phone], by examining

State *v.* Correa

the calls or messag[es] sent, received or missed . . . [to learn about any] communication between a victim, a suspect and conspirator(s) or other potential valuable witness[es] . . . .'' The affidavit did not identify any time parameters within which to limit the search of the defendant's cell phone. The court (*Strackbein, J.*) signed the warrant on June 11, 2018.

When executing the search warrant, the FBI conducted a ''full file system extraction'' to extract all data from the defendant's cell phone. An FBI agent then used software to create ''a human-readable'' report, and the FBI provided the report to state detectives. The state police subsequently reviewed the data provided in the report.

Before trial, the defendant moved to suppress the data extracted from his cell phone in part because the search warrant was ''so overly broad and lacking in particularity that it constitute[d] a general warrant, in violation of the [federal and state constitutions].'' The defendant further claimed that the severance doctrine should not apply because there was nothing constitutional in the search warrant that would remain after severing the unconstitutional parts. Ruling from the bench, the trial court concluded that the warrant was sufficiently particular because it limited the search to the cell phone. It explained that, although the search warrant failed to identify a specific crime, the warrant incorporated by reference the affidavit and application, which did identify the crimes as arson and felony murder. The court further reasoned that, although the search was not ''limited to specific [areas] of the defendant's iPhone,'' the lack of limits on what the police could search was not unreasonable given ''the nature of the crimes . . . .'' The court did conclude, however, that the warrant was unconstitutionally overbroad because it placed no time limit on the data subject to seizure. Applying the severance doctrine, the court suppressed

State *v.* Correa

all data created or received before December 6 and after December 20, 2017. The court indicated that it would articulate the reasons why the state had probable cause for all data searched for that period in a written memorandum of decision.

At trial, the state presented testimony regarding, and documentary evidence of, the data that the FBI extracted from the defendant's cell phone. The data included text messages between the defendant and his father, between the defendant and his sisters, Ruth and Deserea Correa, and between the defendant and Tanisha, that showed that the defendant was the owner of the cell phone; the defendant's GPS location data; the defendant's Google Maps searches of the Lindquists' address; the defendant's TextNow communications with Matthew; application usage history, showing that the defendant had uninstalled the TextNow application several hours after the murders and other crimes were committed; the defendant's searches on YouTube and other applications for strategies to break into a gun safe; an Internet search for the "six o'clock news" after the crimes occurred; a text message from Tanisha sent shortly after the defendant and Ruth left Hartford the night of December 19, 2017, saying, in relevant part, "[b]e careful and pay attention to every little detail, no matter what it is," and "please be careful"; call logs showing that the defendant had missed calls from Tanisha the next morning; a text message from Tanisha asking the defendant to provide his location; photographs of Kenneth's cell phone that the defendant sent to Deserea in the late morning, on December 20; photographs of Kenneth's computer monitor; a text message from the defendant, sent on December 24, saying he "put everything leather in [his] car"; and Tanisha's message to the defendant, which was sent a few days later, stating that "[she] can't drive the car with the seat like that, so [she] can't go anywhere . . . ."

State *v.* Correa

During closing argument, the prosecutor reviewed the testimony of each witness the state presented and pertinent exhibits. When reviewing the testimony of the FBI forensic analyst who extracted the data from the defendant's cell phone, the prosecutor referenced much of the evidence listed in the preceding paragraph. He argued that the data confirmed parts of Ruth's testimony about the defendant's location, that the defendant "owned [the cell phone] and . . . possessed it at certain times," and, "[m]ost significantly," that Tanisha had texted the defendant on the night of the incident, shortly after he left for Griswold, to "[b]e careful" and to "pay attention . . . ." During closing argument, defense counsel primarily argued that Ruth and Tanisha lacked credibility. He also argued, among other things, that the cell phone evidence neither salvaged their testimony nor independently established the defendant's guilt.

After the trial, the court issued its memorandum of decision, which addressed the defendant's pretrial motion to suppress the data extracted from his cell phone. The trial court quoted *United States* v. *Purcell*, 967 F.3d 159, 178 (2d Cir. 2020), cert. denied, U.S. , 142 S. Ct. 121, 211 L. Ed. 2d 39 (2021), which explained that, "[t]o satisfy the [f]ourth [a]mendment's particularity requirement, a warrant must meet three criteria: (1) it must identify the specific offense [or offenses] for which the police have established probable cause; (2) it must describe the place to be searched; and (3) it must specify the items to be seized by their relation to designated crimes." (Internal quotation marks omitted.) Id. The trial court concluded that the warrant was sufficiently particular because it (1) incorporated the affidavit and application, which identified the specific offenses, and (2) described the cell phone as the place to be searched. The court acknowledged that the warrant did not meet the third *Purcell* requirement because it "conspicuously fail[ed] to identify . . . how the iPhone

State *v.* Correa

and areas therein relate to said offenses.'' The court nonetheless concluded that, ''[a]lthough far from a model of particularity, the . . . warrant contain[ed] just enough information to save it from being deemed facially unconstitutional.'' The court also concluded that the warrant was unconstitutionally overbroad because it failed to place time parameters on the search, which would effectively allow the police to search ''wholly irrelevant digital data, potentially generated months before the crimes under investigation.'' The court explained that ''partial severance'' was an appropriate remedy. It reasoned that partial severance would allow the court ''to strike out any constitutionally deficient items in the particularity portion of a warrant and to determine the propriety of the search on the basis of the valid remainder.'' *State* v. *Browne*, 291 Conn. 720, 745, 970 A.2d 81 (2009).

Although, in its pretrial bench ruling, the trial court had severed all data extracted from the defendant's cell phone that was created or received after December 20, 2017, in its memorandum of decision, which was issued after the case was fully tried, the court modified its original ruling and ''additionally conclude[d] that probable cause existed for the search and seizure of digital data received or created up until the time that the defendant's iPhone was seized by detectives on December 28, 2017.'' It explained that probable cause existed for this extended period ''[b]ased on the somewhat ambiguous nature of the defendant's relationship with Matthew . . . at the time that [the defendant's] iPhone was seized . . . .'' The court acknowledged the ''awkwardness'' of this ''blanket ex post temporal restriction.'' Yet, it explained that this remedy was ''the only way of guaranteeing that the defendant receives a fair trial, while simultaneously allowing the admission of certain pieces of digital evidence for which probable cause existed.''

State *v.* Correa

On appeal, the defendant makes two claims. First, he argues that the warrantless seizure of his cell phone after his interview was unlawful because the police lacked probable cause at that time to do so and no exigency existed. Second, he contends that the trial court should have suppressed all of the data extracted from his cell phone. He primarily claims that the warrant constituted an impermissible general warrant because it lacked particularity on its face and failed to specify time parameters to limit the data to be searched. The defendant argues that the trial judge erred in attempting to retroactively cure the warrant by creating particularity when none existed and, sua sponte, expanding the period not subject to severance after the trial had concluded. The defendant claims that admitting evidence from his unlawfully searched cell phone was not harmless beyond a reasonable doubt because the prosecutor relied on it during closing argument, and the jury may not have otherwise found Ruth's and Tanisha's testimony credible.

The state argues that the police had probable cause to seize the defendant's cell phone and that they were justified in seizing it because they feared that the defendant would destroy any evidence on the cell phone. The state contends that the subsequent warrant to search the defendant's cell phone was sufficiently particular because the incorporated affidavit listed the crimes and explained why the state sought to search the defendant's cell phone data. The state also claims that, because technological limits on extracting data did not allow for targeted extractions, it was appropriate that the warrant did not provide time limits. Acknowledging that the warrant lacked time limits, the state contends that the trial court properly suppressed, under the severance doctrine, all data created or received before December 5 and after December 28, 2017. Finally, the state claims that any error was harmless beyond a reasonable doubt.

State *v.* Correa

Assuming, without deciding, that the warrantless seizure of the defendant's cell phone was constitutional, we conclude that the search warrant violated the fourth amendment because it lacked particularity.[5] We further conclude that the trial court erred in applying the severance doctrine under these circumstances. Accordingly, the evidence derived from the unlawful search of the defendant's cell phone data should have been suppressed. We agree with the state, however, that the error was harmless beyond a reasonable doubt. We address each issue in turn.

## A

### Particularity

We begin with the defendant's claim that the search warrant lacked particularity. The defendant contends that the warrant lacked particularity because it failed to identify the offenses for which the police had probable cause to search his cell phone. The defendant argues that, even if the warrant incorporated by reference the affidavit and application, that would not cure the warrant's lack of particularity because the warrant and supporting documents still authorized the search and seizure of "all data" on the defendant's cell phone. Regardless, the defendant claims that the state did not present evidence that the affidavit and application accompanied the warrant when it was executed. The defendant also contends that the warrant lacked particularity because it contained no time parameters to limit the data to be searched and seized and failed to describe the relationship between the items to be searched and seized and the alleged crimes. We conclude that the

_____

[5] Because we conclude that all evidence from the defendant's cell phone should have been suppressed but that any error was harmless beyond a reasonable doubt, we do not reach the defendant's claim that the warrantless seizure of his cell phone at the end of the police interview violated the fourth amendment.

State *v.* Correa

warrant did not meet the fourth amendment's particularity requirement.[6]

We begin with the standard of review and guiding legal principles applicable to our particularity inquiry. Whether a warrant satisfies the fourth amendment's particularity requirement is "a question of law that we decide de novo." (Internal quotation marks omitted.) *State* v. *Smith*, 344 Conn. 229, 249, 278 A.3d 481 (2022). The fourth amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the [particularity] requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the [f]ramers intended to prohibit." *Maryland* v. *Garrison*, 480 U.S. 79, 84, 107 S. Ct. 1013, 94 L. Ed. 2d 72 (1987). Accordingly, "[a] search warrant satisfies the fourth amendment's particularity requirement if it identifies the place

_____

[6] The defendant alternatively argues that the warrant was unconstitutionally overbroad because the police lacked probable cause to seize and search "all data" on his cell phone. Because the defendant's principal claim on appeal is with respect to particularity, and we conclude that the warrant lacked particularity both as to the place to be searched and items to be seized, we need not address his alternative argument relating to overbreadth at length. We note, however, that, due to the unparticularized nature of the warrant at issue, it authorized the search of some data unsupported by probable cause and was, therefore, overbroad. See, e.g., *United States* v. *Nejad*, 436 F. Supp. 3d 707, 725 (S.D.N.Y 2020) ("Breadth and particularity are . . . 'related but distinct concepts.' . . . The two are related in that a warrant's unparticularized description of the items subject to seizure may cause it to exceed the scope of otherwise duly established probable cause. However, they are distinct in that a broad warrant does not necessarily lack particularity . . . ." (Citation omitted.)); see also, e.g., *United States* v. *Ray*, 541 F. Supp. 3d 355, 398 (S.D.N.Y 2021) ("[a]lthough a lack of particularity can result in a warrant's overbreadth, a broad warrant does not necessarily lack particularity").

State *v.* Correa

or thing for which there is probable cause to search with sufficient definiteness to preclude indiscriminate searches.'' (Internal quotation marks omitted.) *State* v. *Smith*, supra, 249. To be sufficiently definite and to avoid authorizing indiscriminate searches, ''(1) [the warrant] must identify the specific offense [or offenses] for which the police have established probable cause; (2) it must describe the place to be searched; and (3) it must specify the items to be seized by their relation to designated crimes.'' (Internal quotation marks omitted.) *United States* v. *Purcell*, supra, 967 F.3d 178; see also, e.g., *State* v. *Hamilton*, 214 Conn. 692, 706–707, 573 A.2d 1197 (describing particularity requirement's purpose as preventing general warrants that would authorize ''a general exploratory rummaging in a person's belongings'' (internal quotation marks omitted)), vacated on other grounds, 498 U.S. 933, 111 S. Ct. 334, 112 L. Ed. 2d 299 (1990). ''A warrant is facially unconstitutional if it fails to comply with any of these requirements.'' *United States* v. *Purcell*, supra, 178.

In general, ''[s]pecificity in the application for a warrant does not cure facial deficiencies in the warrant itself.'' Id., 179. After all, ''[t]he [f]ourth [a]mendment by its terms requires particularity in the warrant, not in the supporting documents.'' *Groh* v. *Ramirez*, 540 U.S. 551, 557, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004). However, ''a court may construe a warrant with reference to a supporting application or affidavit if,'' at the very least, ''the warrant uses appropriate words of incorporation . . . .'' Id., 557–58. But see id. (noting that ''most [federal] [c]ourts of [a]ppeals have held that'' supporting documents must also accompany warrant when it is executed); see also *State* v. *Browne*, supra, 291 Conn. 736–37 (concluding that ''*Groh* left this split of authority unresolved'' because it merely acknowledged approach generally followed by courts of appeals but did not clarify rule and that ''the correct approach

State *v.* Correa

does not require incorporation and accompaniment in every situation'' (emphasis omitted)). In short, a facially deficient warrant might still meet the fourth amendment's particularity requirement if it incorporates by reference an affidavit and application that would meet the particularity requirement. See *State* v. *Browne*, supra, 737.

The defendant first argues that the warrant did not meet the particularity requirement because it failed to identify the specific crimes for which evidence was sought. The defendant acknowledges that the affidavit and application identified the crimes as arson and felony murder. But he claims that the boilerplate language in the warrant is not sufficient to incorporate the affidavit and application. We disagree.

In considering a fourth amendment challenge to a warrant, this court in *State* v. *Browne*, supra, 291 Conn. 720, considered whether the warrant at issue ''incorporate[d] by reference the application and . . . affidavit.'' Id., 734. The warrant in *Browne* used nearly identical language as the warrant in the present case. See id., 734–35 n.8. The warrant in this case provided: ''The foregoing [a]ffidavit and [a]pplication for [s]earch and [s]eizure [w]arrant having been presented to and been considered by the undersigned, a [j]udge of the Superior Court or a [j]udge [t]rial [r]eferee, and the foregoing [a]ffidavit having been subscribed and sworn to by the affiant(s) before [the undersigned] at the time it was presented, the undersigned (a) is satisfied therefrom that grounds exist for said application, and (b) finds that said affidavit established grounds and probable cause for the undersigned to issue this [s]earch and [s]eizure [w]arrant, such probable cause being the following: From said affidavit, the undersigned finds that there is probable cause for the undersigned to believe that the property described in the foregoing affidavit and application is within or upon the person, if any, named or described

State *v.* Correa

in the foregoing affidavit and application, or the place or thing, if any, described in the foregoing affidavit and application, under the conditions and circumstances set forth in the foregoing affidavit and application, and that, therefore, a [s]earch and [s]eizure warrant should issue for said property.''[7] It further commanded an officer or inspector to "enter into or upon and search the place or thing described in the foregoing affidavit and application . . . .'' Based on substantively identical language, this court in *Browne* concluded that "the warrant . . . *did* explicitly incorporate by reference the application and accompanying affidavit.'' (Emphasis in original.) *State* v. *Browne*, supra, 734. We have little trouble concluding that the warrant in the present case incorporated the affidavit and application because the relevant language of the warrant in *Browne* and the present case is substantively identical. Accordingly, because the properly incorporated affidavit and application listed the specific crimes, we conclude that the warrant satisfied the first particularity requirement.

The defendant also argues that the warrant's authorization to search and seize "all data'' did not meet the particularity requirement because it failed to identify, and therefore limit, the specific data on his cell phone to be searched and seized or to explain how that data related to the alleged crimes. He further contends that the affidavit and application did not cure this defect because that document simply repeats the language in the warrant. The state claims that the warrant identified specific data when it listed "all data contained [in the defendant's cell phone] . . . including, but not limited to, all call logs . . . SMS and MMS [t]ext messaging,

---

[7] The only difference between the warrant at issue in *Browne* and the warrant in this case is that the latter adds the following language after "[j]udge of the Superior Court'': "or a [j]udge [t]rial [r]eferee, and the foregoing [a]ffidavit having been subscribed and sworn to by the affiant(s) before [the undersigned] at the time it was presented . . . .''

State *v.* Correa

telephone numbers stored, address book, calendar, email, video files, and graphic files.'' The state argues that this court should interpret the clause ''including, but not limited to,'' as a limit on the data that can be searched. We agree with the defendant.

The United States Supreme Court has emphasized that ''[c]ell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person.'' *Riley* v. *California*, 573 U.S. 373, 393, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014). Given a cell phone's ''immense storage capacity''; id.; and ability to function as ''a digital record of nearly every aspect of [its owner's life]''; id., 395; this court has ''conclude[d] that a warrant for the search of the contents of a cell phone must be sufficiently limited in scope to allow a search of only that content that is related to the probable cause that justifies the search.'' *State* v. *Smith*, supra, 344 Conn. 250. In *Smith*, this court explained that one way a warrant can limit the scope of cell phone contents to be searched is by ''[describing] the areas within the cell phone to be searched . . . .'' Id., 252. We concluded that one of the warrants at issue in *Smith* failed to limit the search of the cell phone because it did not ''[describe] the areas within the cell phone to be searched'' at all; id.; instead, it simply authorized a full '' 'data extraction' '' of the cell phone. Id., 251. As a result, we concluded that the warrant violated the fourth amendment's particularity requirement because such a broad search ''did not sufficiently limit the search of the contents . . . .'' Id., 252. By failing to do so, it ''allowed for a search of the entire contents of the cell phone.'' Id., 251.

Here, the warrant authorized the search and seizure of ''all data contained [in the defendant's cell phone] . . . including, but not limited to, all call logs of calls placed and received, SMS and MMS [t]ext messaging, telephone numbers stored, address book, calendar,

State *v.* Correa

email, video files, and graphic files.'' Although the warrant listed some types of information, in contrast to the warrant at issue in *Smith*, it also provided that the authorized search ''[was] not limited to'' the representative types of information listed. Moreover, the warrant ''included no time parameters to cabin the scope of the search . . . .'' *State* v. *Smith*, supra, 344 Conn. 252. By authorizing a search of ''all data,'' without a time limit, the warrant effectively authorized ''a search of the entire contents of the cell phone,'' regardless of the type of information or the date the information was created or received. *State* v. *Smith*, supra, 251. The failure to limit what could be searched or seized on the defendant's cell phone by content and by time clearly violates the second and third particularity requirements. See *United States* v. *Purcell*, supra, 967 F.3d 178.

We decline the state's invitation to conclude that the phrase ''including, but not limited to,'' places a meaningful limit on ''all data.'' See, e.g., *United States* v. *Lofstead*, 574 F. Supp. 3d 831, 844 (D. Nev. 2021) (concluding that '' 'including, but not limited to,' '' language in search warrant did not limit search of '' 'all' '' data on cell phone), appeal dismissed, Docket No. 21-10375, 2022 WL 866324 (9th Cir. January 4, 2022); *United States* v. *Winn*, 79 F. Supp. 3d 904, 918–19 (S.D. Ill. 2015) (same), appeal dismissed, United States Court of Appeals, Docket No. 15-1500 (7th Cir. June 16, 2015). ''Merely enumerating all potential search areas does not satisfy particularity.'' *United States* v. *Lofstead*, supra, 844. Addressing a similar set of facts, the Delaware Supreme Court provided an instructive analogy: ''[I]f law enforcement submits an affidavit with sufficient facts to support a search of one closet in one room of a house, a warrant authorizing a search of the entire house does not become sufficiently particular because it identifies each individual room in the house rather than saying

State *v.* Correa

'any and all rooms.' '' *Terreros* v. *State*, 312 A.3d 651, 670 (Del. 2024).

We further note that the record in the present case undermines the state's argument because, at trial, the state presented evidence from multiple types of information that were not included in the warrant's representative list, including GPS data location, Internet searches, and application usage history. The state cannot rely on types of information not enumerated in the search warrant at trial and, on appeal, claim that the same list somehow placed a limit on the types of information the state was authorized to search and seize. For these reasons, we are not persuaded by the state's argument that the warrant limited the search of "all data" on the defendant's cell phone by using the clause "including, but not limited to . . . ."

The state argues, however, that the "not limited to" language simply reflects the reality that it may not know in advance where in a cell phone particular content may be found. We acknowledge that drafting a warrant to search a cell phone may present a challenge in certain situations. But this court's reasoning in *Smith* suggests that, under some circumstances, a warrant to search a cell phone's contents must only list the types of information to be searched within reasonable time parameters to meet the particularity requirement. See *State* v. *Smith*, supra, 344 Conn. 251–52. Consequently, even if the police have difficulty knowing in advance where certain content may be located in a phone, providing reasonably tailored limits on the time and types of information that the police can search in the warrant application may help the state avoid constitutional infirmities.

In the present case, the affidavit itself shows that the police *could have* provided a sufficiently particularized description of the information to be searched and seized. For example, after more than six months of

State *v.* Correa

investigation, the police affiants asserted, among other things, that Ruth had told the police that the defendant had "used his cell phone to call Matthew . . . for directions and also to navigate back to Hartford after leaving the [Lindquists' house]." Based on Ruth's statement and Matthew's TextNow communications with the defendant, the police had precise knowledge of the types of information that were related to the crimes, including GPS data, Google Maps searches, Internet searches, call logs, and text messages. And the police knew the dates and times that Matthew and the defendant had communicated and the date of the crimes. As a result, the police could identify which types of information they were searching for and a relevant time frame for the search.

Permitting broadly worded warrants under these circumstances would hold warrants to search a cell phone's contents to a lower level of fourth amendment scrutiny than all other types of search warrants. The United States Supreme Court has rejected this reasoning and has explained that the unique storage and tracking capacity of cell phones compels greater sensitivity to the fourth amendment's particularity requirement, not less. See *Riley* v. *California*, supra, 573 U.S. 393–97; see also, e.g., *United States* v. *Galpin*, 720 F.3d 436, 447 (2d Cir. 2013) (applying "a heightened sensitivity to the particularity requirement in the context of digital searches"); *State* v. *Smith*, supra, 344 Conn. 250 (requiring "that a warrant for the search of the contents of a cell phone . . . be sufficiently limited in scope"). Accordingly, we are not persuaded that we should allow the state to employ broadly worded warrants for cell phones because it would effectively exempt warrants to search cell phones from the fourth amendment's particularity requirement.

The state also claims that the FBI lacked the technology to conduct a targeted extraction of the cell phone's

State *v.* Correa

data when the FBI conducted the extraction in 2018. The state claims that, given the technological limitations that existed in 2018, the warrant was sufficiently particular. We are not persuaded. Even if the technology that the FBI used to extract unreadable cell phone data was not capable of targeting its extraction by content type or time, investigators stated during a pretrial hearing that they had the technological capability to limit the human-readable report by content type and time. Accordingly, we cannot conclude that the former extraction technology posed a barrier to compliance with the fourth amendment's particularity requirement under these circumstances. Even if it had, it would be immaterial because the warrant itself lacked particularity.

In sum, we conclude that the warrant violated the defendant's fourth amendment right because it lacked particularity by failing to limit the type of content to be searched and seized or to provide any time parameters. The warrant's only limitation is its reference to the crimes of arson in the first degree and felony murder. But, when a warrant's only limiting feature is its reference to a violation of a criminal statute, it "will not satisfy the [f]ourth [a]mendment's particularity requirement when the police could have more precisely described the evidence that they were seeking or included other limiting features." *United States* v. *Winn*, supra, 79 F. Supp. 3d 921; see also, e.g., *Cassady* v. *Goering*, 567 F.3d 628, 636 (10th Cir. 2009) (noting that "[i]t is not enough that [a] warrant makes reference to a particular offense" and that, instead, "the warrant must [ensure] that [the] search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause" (internal quotation marks omitted)). Because the warrant in the present case lacked any time or content limits, the FBI and the police "simply exercised [their] unfettered discretion in determining which files to scroll past and

State *v.* Correa

which files to open and examine pursuant to" the warrant. *United States* v. *Holcomb*, 132 F.4th 1118, 1129 (9th Cir. 2025). Accordingly, we conclude that the warrant did not satisfy the fourth amendment's particularity requirement.[8]

## B

### Severance

Having concluded that the warrant lacked particularity, we next consider whether the trial court properly applied the doctrine of severance to cure the warrant's deficiencies. We conclude that it did not.

We begin with the guiding legal principles. In general, all evidence obtained pursuant to a warrant that does not meet the fourth amendment's particularity requirement must be suppressed, unless an exception applies. See, e.g., *State* v. *Smith*, supra, 344 Conn. 252. However, "[t]he severance doctrine allows a [trial] court, under certain circumstances, to strike out any constitutionally deficient items in the particularity portion of a warrant and to determine the propriety of the search on the basis of the valid remainder." *State* v. *Browne*, supra, 291 Conn. 745. See generally 2 W. LaFave, Search and Seizure (6th Ed. 2020) § 4.6 (f), pp. 801–805 (describing origin and development of severance doctrine). If the severance doctrine applies, then only evidence obtained under the portions of a warrant that lack particularity must be suppressed. In *Browne*, we applied the multistep analysis used by the United States Court of Appeals for the Tenth Circuit "to determine whether severability is applicable." (Internal quotation marks omitted.) *State* v. *Browne*, supra, 747; see *United States* v. *Sells*, 463 F.3d 1148, 1151 (10th Cir. 2006), cert. denied,

---

[8] Because we conclude that the warrant lacked particularity even though it incorporated the affidavit and application, we do not reach the defendant's argument that the incorporated affidavit and application should have accompanied the warrant provided to the FBI agent who executed the initial search.

State *v.* Correa

549 U.S. 1229, 127 S. Ct. 1301, 167 L. Ed. 2d 114 (2007). According to that analysis, a trial court should "[f]irst . . . divide the warrant in a commonsense, practical manner into individual clauses, portions, paragraphs, or categories . . . [and] then evaluate the constitutionality of each individual part to determine whether some portion of the warrant satisfies the probable cause and particularity requirements of the [f]ourth [a]mendment. If no part of the warrant particularly describes [the] items to be seized for which there is probable cause, then severance does not apply, and all items seized [pursuant to] such a warrant should be suppressed." *United States* v. *Sells*, supra, 1151. "Even when a part of a warrant is valid and distinguishable, blanket suppression may still be required if the invalid portions so predominate the warrant that the warrant in essence authorizes a general, exploratory rummaging . . . ." (Internal quotation marks omitted.) *United States* v. *Suggs*, 998 F.3d 1125, 1138 (10th Cir. 2021).

Here, the warrant created only one category of items to be searched, namely, "all data" in the defendant's cell phone. Although the warrant listed some types of information, as we explained, it did not further limit "all data" because the listed categories of data were representative and nonexhaustive. See part II A of this opinion. Because the warrant included only one category, and because we concluded that the warrant lacked particularity, there is no constitutional portion of the warrant that could remain after severing the constitutionally infirm portion. Although the trial court, in its pretrial ruling, purported to apply the severance doctrine by suppressing all data created or received before December 6 and after December 20, 2017, the warrant still authorized the search of "all data" that was created or received within that period. In reality, the court did not "sever" a portion of the warrant at all. Rather, it did the opposite and added a new aspect to the warrant

State *v.* Correa

to create a temporal limitation when none existed originally. To construe that as a severance of the warrant under these circumstances would be to permit a trial court to rewrite the warrant to add limits that would make the warrant constitutional. But the severance doctrine authorizes a trial court only to salvage a constitutional remainder, not to make an insufficiently particular warrant particular. See, e.g., *State* v. *Browne*, supra, 291 Conn. 745. The trial court therefore improperly applied the severance doctrine to the warrant in its pretrial ruling. Because the state does not argue that an exception to the warrant requirement applies, "all items seized [pursuant to the] warrant should be suppressed." *United States* v. *Sells*, supra, 463 F.3d 1151; see also, e.g., *State* v. *Smith*, supra, 344 Conn. 252.

We also address one final point regarding the trial court's application of the severance doctrine to this warrant. In its posttrial memorandum of decision, the court *added* eight days to its initial period of severance by suppressing all data created or received after December 28, 2017. In addition to our conclusion that the severance doctrine does not apply to save this warrant, allowing for the admission of evidence from an additional eight day period is also improper because the defendant was not on notice that the court would admit evidence obtained from December 21 to 28, after previously suppressing evidence from this period in its pretrial ruling. Yet, the state appears to justify this post hoc change, as the trial court also appeared to do, by arguing that the court possessed the authority to amend its previous application of the severance doctrine posttrial under these circumstances. The state primarily cites *Commonwealth* v. *Snow*, 486 Mass. 582, 595, 160 N.E.3d 277 (2021), to support this proposition.

In *Snow*, the Massachusetts Supreme Judicial Court considered, on interlocutory appeal from the trial court's ruling on the defendant's pretrial motion to sup-

State *v.* Correa

press, whether that court properly suppressed cell phone evidence obtained pursuant to a warrant that authorized police "officers to search virtually every area on the [defendant's] cell phone . . . without any date restriction . . . ." (Internal quotation marks omitted.) Id., 591; see also id., 583. The court concluded that partial suppression was proper in part because the state sought to introduce evidence from a limited time frame and it had probable cause to obtain a warrant for that evidence. See id., 583, 590–92, 595. Accordingly, the court remanded the case for further factual findings to determine whether the evidence the state sought to introduce fell within a reasonable scope of time. See id., 590, 595. *Snow* is inapposite to the present case because the Massachusetts high court partially suppressed evidence obtained under a warrant before trial. See id., 583, 590–92. Here, by contrast, the trial court applied the severance doctrine posttrial. Allowing a trial court to retroactively cure a warrant that lacks any content or time limit—whether before or after trial—essentially amounts to a court rewriting a general warrant. But, again, a trial court's authority to review whether a warrant meets the particularity requirement does not authorize it to rewrite a warrant to make it sufficiently particular. If trial courts were authorized to rewrite warrants, before, during or after the presentation of evidence, to make them sufficiently particular, they would effectively abandon their judicial role of neutrality in the administration of justice. Moreover, it is inconsistent with the fundamental principle of fairness to rule after trial that evidence suppressed prior to trial was properly admitted when the defendant had no notice or opportunity to challenge the admission of that evidence.[9] Cf. *In re Yasiel R.*, 317 Conn. 773, 801–

_____

[9] We recognize that the defendant could have objected to the admission of any evidence the state sought to introduce from after December 20, 2017, as being inconsistent with the trial court's pretrial ruling. Nevertheless, the trial court's post hoc rationalization for expanding the scope of time did not rely on the defendant's failure to object.

State *v.* Correa

802, 120 A.3d 1188 (2015) (*Zarella, J.*, concurring in part and dissenting in part) (subjecting party to "a rule of which it had no prior notice" raises "fairness and due process concerns").

C

Harmlessness

We next consider the state's argument that, even if the evidence was improperly admitted as a result of the unconstitutional warrant, any resulting error was harmless beyond a reasonable doubt. The state claims that any constitutional error was harmless because the evidence obtained from the cell phone was limited and largely cumulative of other evidence admitted at trial. It further argues that this evidence was harmless because evidence of the defendant's guilt was overwhelming and corroborated by independent evidence. The state also claims that Ruth's and Tanisha's testimony was amply corroborated by independent evidence.

The defendant contends that the state cannot establish that any error was harmless beyond a reasonable doubt. The defendant emphasizes that four pieces of evidence obtained from the defendant's cell phone were critical to the state's case because they corroborated the testimony of Ruth and Tanisha. First, the defendant points to the GPS location data showing that the defendant traveled from his apartment in Hartford late December 19, 2017, arrived near the Lindquists' house, left early in the morning on December 20, and traveled back to Hartford after a short stop in Glastonbury, where Matthew's burned car was later found. Second, the defendant argues that the text message exchanges with his father, Ruth, Deserea and Tanisha established that he possessed the cell phone during the relevant time period of late December 19 to early December 20, and not Ruth. Third, the defendant contends that the Internet searches on his cell phone showed that he had researched

State *v.* Correa

"how to crack a gun safe'' on December 19 and that photographs of safes and tools for picking locks were also discovered on his cell phone, which was not established by any other properly admitted evidence. Finally, the defendant further contends that his text messages with Tanisha showed that she had texted the defendant "[to] [b]e careful and [to] pay attention to every little detail'' while he traveled to the Lindquists' house, and additional messages showed that the defendant was not home with Tanisha the morning of December 20. The defendant argues that, without this evidence, the jury might not have credited the testimony of Ruth and Tanisha, who the defendant claims were otherwise unreliable witnesses. Having reviewed the record in this case, we are convinced that the error in admitting the evidence obtained from the defendant's cell phone, pursuant to an unconstitutional warrant, was harmless beyond a reasonable doubt.

We begin with the applicable standard of review. It is well established that "the test for determining whether a constitutional [error] is harmless . . . is whether it appears beyond a reasonable doubt that the [error] complained of did not contribute to the verdict obtained. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]. . . . Additional factors that we have considered in determining whether an error is harmless in a particular case include the importance of the challenged evidence to the prosecution's case, whether it is cumulative, the extent of cross-examination permitted, and the presence or absence of corroborating or contradicting evidence or testimony." (Internal quotation marks omitted.) *State* v. *Johnson*, 345 Conn. 174, 196, 283 A.3d 477 (2022). "In other words, we [must be] satisfied

State *v.* Correa

beyond a reasonable doubt that the result would be the same without the admission of the assumedly improper evidence.'' *State* v. *Jordan*, 314 Conn. 89, 104, 101 A.3d 179 (2014). ''This inquiry is an objective one and requires us to consider the quality and quantity of both the inadmissible evidence and the admissible evidence that remains to support the verdict of the jury.'' *State* v. *Sayles*, 348 Conn. 669, 683, 310 A.3d 929 (2024). ''[T]he [harmless error] inquiry cannot be merely whether there was enough [evidence] to support the result, apart from . . . the error. . . . [R]ather, [the inquiry is] . . . whether the error itself had substantial influence [on the jury]. If so . . . the conviction cannot stand.'' (Internal quotation marks omitted.) Id., 702 (*Ecker*, *J.*, dissenting), quoting *Kotteakos* v. *United States*, 328 U.S. 750, 765, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946).

Our review of the record, independent of the improperly admitted evidence, demonstrates that the state presented a wealth of evidence that the defendant had committed murder with special circumstances, robbery, home invasion, and arson. To begin, Matthew's TextNow messages with the defendant established that the defendant planned to break into the Lindquists' house and to steal Kenneth's gun safe and guns, and that the defendant arrived near the Lindquists' house around 12:30 a.m. on December 20, 2017. Ruth testified that the defendant brought a machete and a baseball bat with him. CSLI established that the defendant's cell phone was located near the Lindquists' house beginning around 12:30 a.m. and that it remained in that area until around 4:30 a.m. Ruth testified that, after she and the defendant arrived and spoke with Matthew, the defendant chased Matthew and hit him in the back of the head with the machete. She further testified that they both stabbed Matthew numerous times, until he stopped moving. Ruth's testimony was consistent with the conclusion of the medical examiner who performed Mat-

State *v.* Correa

thew's autopsy that Matthew died by homicide and had at least sixty-seven sharp force injuries, including "a chop type wound [in] the back of [his] head," likely caused by a "heavy" and "sharp cutting implement," that fractured his skull. Ruth further testified that she and the defendant had entered the Lindquists' house through an open basement door and that the defendant had killed Kenneth by hitting him in the head with the baseball bat. Ruth's testimony was consistent with the conclusion of the medical examiner who performed Kenneth's autopsy that Kenneth died by blunt force trauma to the head. Tanisha also testified that the defendant had confessed to killing Kenneth. Ruth further testified that the defendant had killed Janet by hitting her in the head with the baseball bat and then strangling her. This testimony was consistent with the conclusion of the medical examiner who performed Janet's autopsy that Janet died by homicide due to, among other things, blunt force trauma to the head and smoke inhalation. Because Ruth testified that she and the defendant had both poured accelerants throughout the house and that the defendant had set the house on fire, the jury could have found that either the defendant's blows or the fire that the defendant had started killed Janet. Ruth also testified that she and the defendant had stolen many items from the Lindquists' house, including Kenneth's computer monitor, which the police found in the back seat of the defendant's car. Tanisha testified that the defendant showed her multiple items that matched the description of items stolen from the Lindquists' house just hours after the murders, including Christmas gifts and two guns. The police found Kenneth's computer monitor in the back seat of the defendant's car approximately eight days after the murders. In short, the state presented exceptionally strong evidence that the defendant had planned to commit a robbery, had arrived at the Lindquists' house with weapons, had killed Mat-

State *v.* Correa

thew, Kenneth and Janet, had stolen various items from their house, and had set the house on fire. Accordingly, the state's case against the defendant was strong, independent of the improperly admitted evidence from the defendant's cell phone.

The defendant's principal argument to rebut this persuasive evidence is that Ruth and Tanisha were unreliable witnesses and that the improperly admitted cell phone evidence was therefore critical to the state's case because, without it, the jury would not have credited their testimony. We disagree. The state presented overwhelming evidence that independently corroborated key details of Ruth's testimony. For example, the state submitted CSLI and security camera footage corroborating Ruth's testimony regarding the defendant's location at the scene of the crimes, their stop in Glastonbury, their arrival in Hartford, as well as the time these events occurred. The TextNow messages between Matthew and the defendant confirmed that the defendant had planned to commit at least robbery and home invasion, arrived at the Lindquists' house early in the morning on December 20, 2017, and possessed the cell phone when he arrived at their house. Testimony from the state's medical examiners regarding the victims' causes of death was consistent with Ruth's testimony about how the defendant had killed the victims. A fire investigator testified that the house fire was caused by human intervention, which was consistent with Ruth's testimony that the defendant had set the Lindquists' house on fire. A photograph from the fire investigation also revealed that the gun safe was open, which, coupled with the defendant's TextNow messages that were recovered from Matthew's cell phone, indicating that he planned to break into the safe to steal Kenneth's guns, lends credence to Ruth's statement that the defendant had pointed a gun at Janet. Tanisha's testimony also corroborated aspects of Ruth's testimony. Tanisha

State *v.* Correa

testified that the defendant had shown her stolen items, located in the trunk of his car, that were consistent with items stolen from the Lindquists' house, including Christmas bags and two guns. She further testified that the defendant had confessed to killing Kenneth and that he had changed the material covering the seats in his car within days of the murders. Finally, Ruth's message, which she sent to a friend on December 20, saying that everything went "[a]ccording to plan," corroborates her testimony at trial that the defendant had a plan to at least break into the Lindquists' house and to steal items from the house. In short, overwhelming, independent evidence existed to corroborate key details of Ruth's testimony.

The state also presented evidence to corroborate key details from Tanisha's testimony. A police officer testified that he discovered a computer monitor in the back seat of the defendant's car. A state forensic analyst testified that the defendant's DNA was detected on the monitor. Ruth also testified that she and the defendant had placed stolen items in the defendant's car. Each piece of evidence corroborates Tanisha's testimony that the defendant showed her certain items that were in the trunk of his car in the morning of December 20, 2017. Moreover, testimony by investigators indicated that the seats in the defendant's car were not properly bolted, which corroborated Tanisha's testimony that the defendant had changed the material covering the seats in his car sometime before December 25. Finally, Ruth's testimony that the defendant had killed Kenneth corroborates Tanisha's testimony that the defendant had confessed to killing Kenneth. For these reasons, we also conclude that the state presented overwhelming, independent evidence to corroborate key details of Tanisha's testimony.

Based on our review of the record, we also observe that the evidence from the defendant's cell phone was

State *v.* Correa

largely cumulative of properly introduced evidence. The most significant pieces of evidence from the defendant's cell phone were his Internet searches for how to pick a lock on a gun safe, Tanisha's text message to the defendant "[to] [b]e careful and [to] pay attention to every little detail," and the photographs of Kenneth's cell phone. The defendant contends that this evidence was not cumulative of other evidence introduced at trial. We disagree. The TextNow messages between Matthew and the defendant show that the defendant had planned to learn how to break into the gun safe by picking the lock and that he had obtained a tool to do so. They also show that the defendant planned to break into the Lindquists' house and to steal the gun safe and guns. A photograph taken by investigators after the fire showed that the gun safe had been opened. After Ruth testified that a machete and a baseball bat were the only weapons that she and the defendant had brought into the Lindquists' house, Ruth also testified that the defendant had pointed a gun at Janet. Ruth texted a friend hours after the crimes that everything had gone "[a]ccording to plan." As a result, this independent evidence adequately established the defendant's plan to commit robbery and home invasion. Regarding the photographs of Kenneth's cell phone that were retrieved from the defendant's cell phone, the state introduced independent evidence that the defendant possessed stolen items from the Lindquists' house, including Kenneth's computer monitor, which investigators found in the back seat of the defendant's car. The state also introduced evidence establishing that the defendant's DNA was detected on Kenneth's computer monitor and that Kenneth's cell phone was located near the defendant's residence shortly after the crimes occurred. Viewed in the context of Ruth's testimony, this, too, presents independently strong evidence of the defendant's involvement in the robbery and home invasion, apart from the photo-

State *v.* Correa

graphs that were retrieved from the defendant's cell phone.

The defendant also argues that the unlawfully obtained GPS location data was not cumulative because it provided more precise location data than the lawfully obtained CSLI. We are not persuaded that, under the facts of this case, the greater precision of the GPS location data affected the jury's verdict and conclude that this data was cumulative of the CSLI. Although the GPS data was more precise than the CSLI, it did not provide pinpoint accuracy. Instead, it showed the location of the defendant's cell phone within a short range.[10] But the state did not need the greater accuracy that the GPS information afforded to establish the defendant's general location or to support Ruth's testimony. The CSLI established that the defendant traveled from Hartford to an area near the Lindquists' house, remained there for approximately four hours, and returned to Hartford after a short stop in the Glastonbury area. Accordingly, the CSLI achieved the same result as the GPS data, namely, it confirmed the defendant's relative location and Ruth's timeline of events.

Finally, the defendant suggests that the improperly seized text messages with his father, Ruth, Deserea and Tanisha were not cumulative and, therefore, that they affected the verdict. He argues that, without them, the state could not establish that the defendant possessed the cell phone during the relevant times. We are not persuaded. The state introduced ample direct and circumstantial evidence to show that the defendant possessed his cell phone during the relevant times because (1) records from the defendant's cell phone carrier indicated that the cell phone was registered to his name and email addresses, (2) applications on the cell phone

_____

[10] For example, the GPS data suggested that the defendant's cell phone could have been in the middle of Pachaug Pond—which is located near the Lindquists' house—when he was inside the house.

State *v.* Correa

were registered to the defendant's email addresses, (3) the defendant texted Matthew that the car he was driving in was registered in his name, (4) Ruth testified that, while she was driving to Griswold, the defendant was using his cell phone to navigate by GPS, (5) the defendant brought his cell phone with him and operated it during a police interview on December 28, 2017, during which he told the police it was his cell phone, and (6) Tanisha testified that the defendant was afraid that the police would unlock and search his cell phone after the crimes occurred. Although Ruth testified that, on occasion, she used the defendant's cell phone to make calls because her cell phone worked only with a Wi-Fi connection, there was nothing in the record to indicate that Ruth ever kept the defendant's cell phone in her possession longer than the time it took to make a phone call or that she used it at all when he was not present. Accordingly, we conclude that this evidence established that the defendant possessed the cell phone during the relevant times, independent of the improperly admitted text messages.

In sum, we are not persuaded that the jury would have discounted Ruth's and Tanisha's testimony in the absence of the improperly admitted cell phone evidence because the state presented independent evidence that corroborated their testimony and because the cell phone evidence itself was cumulative of other evidence that was properly introduced at trial. For those reasons, we also cannot conclude that the cell phone evidence was critical to the state's case. In addition, even if the jury had some basis to view Ruth's and Tanisha's testimony with some skepticism, as the defendant emphasizes, defense counsel extensively cross-examined both witnesses to expose infirmities in their testimony to the jury. See, e.g., *State* v. *Johnson*, supra, 345 Conn. 196 (considering " 'the extent of cross-examination' " as part of harmless error analysis). Our review of the

State *v.* Correa

record demonstrates that the quality of Ruth's and Tanisha's testimony was strengthened by the quality and degree of independent corroboration present in this case.

Finally, in assessing the potential impact of the improperly admitted cell phone evidence on the jury's verdict, we consider the parties' closing arguments to determine the evidence's centrality to the factual issues. To that end, we analyze "the degree of the parties' emphasis and reliance on the improperly admitted evidence [as] indicative of its importance to the jury's verdict." *State* v. *Sayles*, supra, 348 Conn. 695. During closing argument, although the prosecutor did reference the improperly admitted cell phone evidence, the references mostly rehashed the key evidence in the order it was presented at trial. The prosecutor placed greatest emphasis on Ruth's testimony, and, after addressing it, he stated that "much of the remaining evidence . . . confirms Ruth's statement of what happened." The prosecutor largely confined his reference to the cell phone evidence to the order it was presented and expressly stated that the cell phone evidence was important to the extent that it confirmed Ruth's testimony. Accordingly, the evidence, when viewed in context, was not greatly emphasized relative to other evidence.

Defense counsel's closing argument and the prosecutor's rebuttal also show that the cell phone evidence was not critical to the state's case. Defense counsel argued that the cell phone evidence was important only to the extent that it confirmed Ruth's and Tanisha's testimony but that it did not independently establish the defendant's guilt. During his rebuttal argument, the prosecutor challenged defense counsel's argument that the cell phone evidence, in isolation, corroborated Ruth's and Tanisha's testimony. He argued, instead, that the state has "put forward sufficient evidence to prove

[the] defendant guilty on each and every count." Although the prosecutor relied on the cell phone evidence, its role was not so outsized or critical that we can conclude that this factor would be dispositive in our determination of whether the evidence contributed to the jury's verdict. See, e.g., *State* v. *Sayles*, supra, 348 Conn. 698 ("our case law establishes that a prosecutor's reliance on illegally obtained evidence in closing arguments . . . is not dispositive").

We conclude that the evidence against the defendant, viewed cumulatively and in context, was strong, independent of the improperly admitted cell phone evidence. Defense counsel extensively cross-examined Ruth and Tanisha to expose infirmities in their testimony. Although the cell phone evidence may have been important, it was not critical to the state's case against the defendant. Accordingly, we are not persuaded that the improper admission of evidence from the cell phone's contents contributed to or substantially affected the jury's verdict.

The judgment is affirmed.

In this opinion the other justices concurred.

———————————